# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| MICHAEL O'NEILL and | ) Bankruptcy No. 10 B 06832 |
| MARGARET O'NEILL, | ) |
| Debtors, | ) |
| | ) |
| JULIUS RUTILI | ) Adversary No. 10 A 01084 |
| Plaintiff | ) |
| v. | ) |
| MICHAEL O'NEILL and | ) |
| MARGARET B. O'NEILL, | ) |
| Defendants | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL

### INTRODUCTION

This proceeding is related to the Chapter 7 bankruptcy case filed by Debtors Michael and

Margaret O'Neill ("Debtors"). Creditor James Rutili ("Plaintiff"), filed this two-count Adversary

Complaint objecting to their discharge and dischargeability of debt owed by Debtors for a loan

by Plaintiff to them.

Count 1, brought under 11 U.S.C. § 727(a)(4) and (5) alleged that Debtors failed to list

ownership of F.C. Pilgrim & Co. and Pilgrim Mgmt. Co. among their assets in the bankruptcy

petition and schedules or to report loss of that asset pre-bankruptcy, thereby making false oath

and failing to explain loss of assets. The Complaint also alleged Debtors failed to list ownership

of certain real property. The defense has argued that Debtors have amended their schedules so as

to list fully their former interests in those properties and thereby corrected all initial omissions.

They also assert that the interests initially not listed had no value, had been lost prior to their

bankruptcy filing, were not material, and that any failure to list those interests was due to failure of their counsel.

Count II, brought under 11 U.S.C. § 523(a)(2)(A) alleges false representations by Debtor Michael O'Neill concerning ownership in F.C. Pilgrim & Co. and Pilgrim Mgmt. Co. made in order to induce Plaintiff to make a large loan to them. Debtors argue, first, that the statements made by Michael O'Neill regarding ownership interests were not misrepresentations because Michael in fact was the controlling shareholder of a holding company that owned 100% of companies at issue. Debtors also argue that Plaintiff did not rely on the statements asserted because those statements made by Michael were oral, general in nature, and were not part of or directly connected to the loan agreements; and also because Plaintiff had his own reason for investing separate from whatever Michael's ownership interests might have been. Debtors also argue that Plaintiff did no due diligence with respect to Michael's asserted representations and, therefore, did not justifiably rely on any. Finally, Debtors argue that the oral statements in issue were "statements respecting financial condition" that are not actionable under § 523(a)(2)(A) and no financial statement was given by Debtors that might have been actionable under § 523(a)(2)(B).

The following Findings of Fact and Conclusions of Law are made and entered following trial. Pursuant thereto, judgment will enter for Defendants on both Counts.

Incorporated in the discussion below is also analysis of Plaintiff's post-trial Motion to "correct" the Stipulations admitted into evidence. For reasons set forth that Motion will be *denied*.

### *Former Interests of Defendants in "Pilgrim"*

1.      Michael O'Neill and Margaret B. O'Neill (the "Defendants", and occasionally referred to individually as "Michael" or "Defendant Husband" and "Michael's Wife" or "Defendant Wife" to distinguish this Margaret O'Neill, i.e., "Michael's Wife," from Michael's mother, named Margaret T. O'Neill), are married to each other.  Plaintiff's Exhibit (hereinafter referred to as "PX") 64, 65, 66.

2.      Michael O'Neill is the son of John E. O'Neill ("John O'Neill") and Margaret T. O'Neill ("Margaret O'Neill") (collectively, the "Defendant Husband's Parents", and occasionally referred to as "Defendant's Father" or "John" and "Defendant's Mother" or "Margaret") and, the brother of Mary O. Bresnahan ("Mary").  PX 19.

3.      Pilgrim Companies, Inc., ("Pilgrim Companies") F.C. Pilgrim & Co. ("F.C. Pilgrim"), and Pilgrim Management Companies ("Pilgrim Management") (collectively, the "Companies"), are Illinois corporations, each having their respective, principal places of business located in Illinois.  PX 1, 2, 3.

4.      F.C. Pilgrim was formed on or about 1938 and has operated as a real estate broker and realtor, and related functions, in Oak Park, Illinois, and nearby areas since 1938.  PX 2.

5.      John O'Neill and Margaret T. O'Neill, respectively, owned as of the year 2000, the outstanding shares of F. C. Pilgrim.  John owned 59 shares and Margaret owned 41 shares.  PX 19.

6.      Beginning in the year 2000 and continuing up through April 19, 2011, Michael has been the President of F.C. Pilgrim, a licensed real estate broker.  Trial Transcript (hereinafter referred to as "TR") 143:2-12, TR 144:9-11.

- 3 -

7.　　　In the year 2000, Mary worked for F.C. Pilgrim.  PX 7, 8, 9, 19.

8.　　　Pursuant to an Acquisition Agreement dated March 16, 2000, (the "Acquisition Agreement") Pilgrim Companies purchased from John and Margaret all of their respective, issued and outstanding shares of capital stock of F.C. Pilgrim and Pilgrim Management for the sum of One Million Four Hundred Thousand and 00/100 Dollars ($1,400,000.00), plus the issue of two promissory notes, one note being issued to John and the second note issued to Margaret, as described below. PX 19; TR 146:3-13.

9.　　　From and after the date of the Acquisition Agreement, Pilgrim Companies owned 100% of the stock of F.C. Pilgrim, and Pilgrim Companies functioned as a holding company that did not operate any business separate from F.C. Pilgrim and Pilgrim Management.

From April 2000 through December 2009, Michael O'Neill owned 66% of the stock of Pilgrim Companies, Inc. and Pilgrim Management Company. [TR 257:11-17; Trial Stip. at ¶ 7; Defendant's Exhibit (hereinafter referred to as "DX") 8; DX 10; DX 11] From April 2000 through December 2009, the owner of F.C. Pilgrim & Co. was Pilgrim Companies, Inc., and Michael O'Neill was the majority owner/shareholder of Pilgrim Companies, Inc. [Trial Stip. at ¶ 7; DX 8 – 11; TR 257:11-17; DX 8; DX 10; DX 11]. Therefore, Michael O'Neill had a controlling ownership interest in F.C. Pilgrim and Co. from April 2000 through December 2009. [Trial Stip. at ¶ 7; DX 8 – 11; TR 257:11-17; DX 8; DX 10; DX 11].

10.　　　Pursuant to an Installment Note dated January 1, 2000, Pilgrim Companies promised to pay John O'Neill the principal sum of Eight Hundred Twenty Six Thousand and 00/100 Dollars ($826,000.00) ("John's Installment Note").  PX 17.

11.     John's Installment Note was secured by (A) 1,770 voting common shares and 1,770 nonvoting common shares of Pilgrim Companies stock, (B) 59 voting common shares of F.C. Pilgrim stock and (C) 590 voting common shares of Pilgrim Management stock.  PX 17.

12.     Pursuant to an Installment Note dated January 1, 2000, Pilgrim Companies promised to pay Margaret the principal sum of Five Hundred Seventy Four Thousand and 00/100 Dollars ($574,000.00) ("Margaret's Installment Note"). PX 18.

13.     Margaret's Installment Note was secured by (A) 1,230 voting common shares and 1,230 nonvoting common shares of Pilgrim Companies stock, (B) 41 voting common shares of F.C. Pilgrim stock and (C) 410 voting common shares of Pilgrim Management stock. PX 18.

14.     Michael, as President of Pilgrim Companies executed the John O'Neill and Margaret O'Neill Installment Notes (collectively the "Installment Notes"). PX 17, 18.

15(a).   The Installment Notes dated January 1, 2000, both state that a default will occur when:

     a.     "[T]here is a breach of the Pledge Agreement by Pilgrim Companies, Inc. to and in favor of John E. O'Neill, dated January 3, 2000";
     b.     "[T]here is a breach of the Pledge Agreement between Michael M. O'Neill and Mary O. Bresnahan, to and in favor of John E. O'Neill, dated January 3, 2000"; or,
     c.     "[A]t any time payment is not made for at least three (3) months from the due date of the installment payment unless waived in writing by either John E. O'Neill or Margaret T. O'Neill."

PX 17, 18.

15(b).   Paragraph 8 of the Installment Notes dated January 1, 2000 provided that upon any default, the Installment Notes would become immediately due and payable without demand or notice, which were waived. Paragraph 8 also provided that upon default John E. O'Neill or

Margaret O'Neill could foreclose upon the stock provided as security for the Installment Notes in
the form of Assignments Separate From Certificate. Trial Stip. at ¶ 14; DX 2 – 3; PX 18 – 19.

16.    Pursuant to a Pledge Agreement dated January 3, 2000, attached to the
Acquisition Agreement as Exhibit 9A, Pilgrim Companies pledged, among other assets, its 59%
interest in the stock of F.C. Pilgrim to John to secure payment of John's Installment Note. PX
19H.

17.    Pursuant to a Pledge Agreement dated January 3, 2000, attached to the
Acquisition Agreement as Exhibit 9B, Michael pledged, among other assets, his 41% interest in
the stock of Pilgrim Companies and Pilgrim Management to Margaret to secure payment of
Margaret's Installment Note. PX 19O.

18.    Pursuant to an Escrow Agreement dated January 3, 2000, attached to the
Acquisition Agreement as Exhibit 9C, Pilgrim Companies, deposited all of the shares
representing its 59% stock interest in F.C. Pilgrim into escrow, with Richard Burke, Esq., as
escrowee, with directions to transfer said shares upon default by Pilgrim Companies, Inc. of
John's Installment Note. PX 19J.

19.    Pursuant to an Escrow Agreement dated January 3, 2000, attached to the
Acquisition Agreement as Exhibit 9D, Michael deposited all of the shares representing his 59%
interest in Pilgrim Companies and Pilgrim Management into escrow, with Richard Burke, Esq.,
as escrowee, with directions to transfer said shares upon default by Pilgrim Companies, Inc. of
Margaret's Installment Note. PX 19K.

20.    Pursuant to an Assignment Separate From Certificate dated January 3, 2000,
Pilgrim Companies assigned and transferred to John O'Neill a 59% interest in all the shares of

F.C. Pilgrim represented by Certificate Numbers 107, which is attached to the Acquisition

Agreement as Exhibit 9E.  PX 19L.

     21.     Pursuant to an Assignment Separate From Certificate dated January 3, 2000,

Michael O'Neill and Mary Bresnahan assigned and transferred to John O'Neill a 59% interest in

all the shares of Pilgrim Management, represented by Certificate Numbers 2 and 3, which is

attached to the Acquisition Agreement as Exhibit 9F.  PX 19M.

     22.     Pursuant to an Assignment Separate From Certificate dated January 3, 2000,

Michael O'Neill and Mary Bresnahan assigned and transferred to John O'Neill a 59% interest in

all the shares of Pilgrim Companies represented by Certificate Numbers V1, V2, V3, NV1, NV2

and NV3, which is attached to the Acquisition Agreement as Exhibit 9G.  PX 19N.

     23.     Pursuant to an Assignment Separate From Certificate dated January 3, 2000,

Pilgrim Companies assigned and transferred to Margaret O'Neill a 41% interest in all the shares

of F.C. Pilgrim represented by Certificate Numbers 107, which is attached to the Acquisition

Agreement as Exhibit 10E.  PX 19S.

     24.     Pursuant to an Assignment Separate From Certificate dated January 3, 2000,

Michael O'Neill and Mary Bresnahan assigned and transferred to Margaret O'Neill a 41%

interest in all the shares of Pilgrim Management, represented by Certificate Numbers 2 and 3,

which is attached to the Acquisition Agreement as Exhibit 10F.  PX 19T.

     25.     Pursuant to an Assignment Separate From Certificate dated January 3, 2000,

Michael O'Neill and Mary Bresnahan assigned and transferred to Margaret O'Neill a 41%

interest in all the shares of Pilgrim Companies represented by Certificate Numbers V1, V2, V3,

NV1, NV2 and NV3, which is attached to the Acquisition Agreement as Exhibit 10G.  PX 19U.

26.     Pursuant to the Pledge Agreements 9A, 9B, 10A and 10B attached to the

Acquisition Agreement Michael, Mary and Pilgrim Companies all acknowledged and agreed that

the Defendant Husband's Parents could foreclose on the capital stock of F.C. Pilgrim and Pilgrim

Management if F.C. Pilgrim or Pilgrim Management incurred debt in excess of $1,200,000.00.

PX 19H, 19I, 19O, 19P; TR 146:14 – 147:1.

### *Transactions of Defendants With Plaintiff*

27.     During the year 2005, the Defendant Husband told Plaintiff that he wanted to

acquire and develop the real property commonly known as 844 South Humphrey, Oak Park,

Illinois (the "Humphrey Property"), in order to remodel and convert the existing units of the

Humphrey Property and sell them as individual residential condominium units. TR 293:18 –

294:5; TR 301:6-20.

28.     The Defendant Husband was the first party to suggest the Humphrey Property as a

possible real estate investment opportunity. TR 293:24 – 294:2.

29.     On an occasion between February 2005 and April 2005, the Plaintiff, Defendant

Husband and the Defendant Husband's roofer and plumber inspected the Humphrey Property,

and the Defendant Husband stated to the Plaintiff that he was the owner of F.C. Pilgrim in the

presence of the Defendant Husband's roofer and plumber; and no one contradicted the Defendant

Husband's statements. TR 332:15-21; TR 333:2 – 334.11.

30.     On or about March 8, 2005, the Land Trust commonly known as Cosmopolitan L

and Trust no. 32019 (the "Land Trust") was created granting the Plaintiff a 100% beneficial

interest in the Land Trust. PX 24, 25.

- 8 -

31.     On or about the year 2005 and at the time the Land Trust was created, Plaintiff

and Defendant Husband discussed that the Plaintiff intended to be a lender in possible real estate

investment opportunities with the Defendant, including the Humphrey Property. TR 254:7-17;

TR 293:10-23; TR 295:22 – 296:2.

32.     On or about April 19, 2005, the Land Trust acquired title to the Humphrey

Property. PX 25, 26; TR 249:14-18; TR 294:12-21.

33.     The Humphrey Property was purchased by the Land Trust because the Defendant

Husband believed that properties such as the Humphrey Property would have many buyers and

would be sold very quickly. TR 294:22 – 295:9.

34.     The Defendant Husband said that during the year 2005 the real estate investment

market was a so-called "hot market" and that the Humphrey Property was a "hot property".

TR 255:23 – 256:10.

35.     In order to place a down payment on the Humphrey Property the Defendant

Husband requested that the Plaintiff lend $50,000 for a down payment on the Humphrey

Property, to which the Plaintiff agreed. TR 295:10 – 296:7.

36.     On May 4, 2005, Plaintiff and the Defendants entered into a Loan Agreement

("the Loan Agreement"). PX 29; TR 297:9-19.

37.     Pursuant to Paragraph 1 of the Loan Agreement, the promissory note was signed

by the land trust and guaranteed by the Debtors. [PX 31].   Thereby the Defendants jointly and

severally promised to pay to the order of the Plaintiff the total of all advances, loans and finance

charges, together with all costs and expenses for which the Defendants were responsible under

the Loan Agreement. PX 29.

- 9 -

38.     Pursuant to Paragraph 2 of the Loan Agreement, the Plaintiff loaned the total amount of One Million One Hundred Seventy Six Thousand Seven Hundred Fifty Seven and 73/100 Dollars ($1,176,757.73) (the "Original Indebtedness") (including $50,000 previously paid by the Plaintiff) to the Defendants to be utilized by the Defendants for their activities intended to accomplish the acquisition and development of the Humphrey Property. [PX 29; TR 297:9-19]. The promissory note was signed by the land trust and guaranteed by the Debtors. PX 31.

39.     Pursuant to Paragraph 2 of the Loan Agreement, the Defendants acknowledged the existence of the Original Indebtedness to the Plaintiff and agreed to repay the Original Indebtedness pursuant to the Loan Agreement. PX 29.

40.     Pursuant to Paragraph 3 of the Loan Agreement the Defendant Husband, upon execution of the Loan Agreement, was to deliver to the Plaintiff a Promissory Note to the Plaintiff in the total amount of One Million One Hundred Seventy Six Thousand Seven Hundred Fifty Seven and 73/100 Dollars ($1,176,757.73) (the "Initial Promissory Note") dated May 4, 2005. PX 29, 31.

41.     Pursuant to Paragraph 7 of the Loan Agreement, the Defendants acknowledged and represented to the Plaintiff that the sum total of the Original Indebtedness was being utilized by the Defendants for business purposes within the meaning of the Illinois Interest Act, and that the specific use of the Indebtedness was for the acquisition, remodeling, development as a conversion condominium, and resale of the Humphrey Property. PX 29.

42.     On or about May 12, 2005, the Plaintiff and the Defendants executed a collateral assignment of the beneficial interest of the Plaintiff dated May 4, 2005 (the "Assignment"),

relating to the Plaintiff's interest in the Land Trust. PX 28; TR 250:24 – 251:9; TR 297:20 –

298:17.

43.     The Assignment transferred the Plaintiff's beneficial interest in the Land Trust to

the Defendant Husband, and the Defendant Husband gave the Plaintiff a collateral assignment of

the same beneficial interest executed on or about May 12, 2005. PX 27, 28; TR 250:3-6; TR

250:24 – 251:16.

44.     Pursuant to the Initial Promissory Note, the Defendants jointly and severally,

unconditionally guaranteed the payment of all principal, interest and other charges due under the

Initial Promissory Note and payable to the order of the Plaintiff by signing the Guaranty therein.

PX 31.

45.     Further, pursuant to the Initial Promissory Note, the Defendants each personally

guaranteed the full performance by Cosmopolitan Bank and Trust, as Trustee under Trust

Agreement No. 32019, of all other obligations of the maker of the Initial Promissory Note.

PX 31.

46.     On July 29, 2005, Cosmopolitan Bank and Trust, as Trustee under Trust

Agreement No. 32019, executed and delivered a Promissory Note to the Plaintiff in the total

amount of Two Hundred Sixty Thousand and 00/100 Dollars ($260,000.00) (the "Second

Promissory Note") in connection with the re-finance of the Humphrey Property by The Private

Bank, which resulted in the satisfaction of the Initial Promissory Note.  PX 32.

47.     Pursuant to the Second Promissory Note, the Defendants executed and delivered

to Plaintiff a Guaranty by which Defendants, jointly and severally, unconditionally guaranteed

- 11 -

the payment of all principal, interest and other charges due under the Second Promissory Note
and payable to the order of the Plaintiff by signing said Guaranty. PX 32.

48.    The Defendants each executed the Guaranty attached to the Second Promissory
Note, wherein the Defendants personally guaranteed the full performance by Cosmopolitan Bank
and Trust, as Trustee under Trust Agreement No. 32019, of all other obligations of the maker of
the Second Trust Promissory Note. PX 32; TR 253:7-13.

49.    Pursuant to Paragraph 5 of the Loan Agreement, the Defendants executed a
Promissory Note dated May 4, 2005, whereby the Defendants agreed to pay the total amount of
Fifteen Thousand and 00/100 Dollars ($15,000.00) (the "Third Promissory Note") to the
Plaintiff.  PX 31.

50.    In order to protect his interests, Plaintiff requested and obtained the guarantee
from Defendants on both the Initial Promissory Note and the Second Promissory Note. [TR
301:21 – 302:9].  Such guarantee was discussed in connection with the Loan Agreement when
the loan documents were provided for execution by Plaintiff's counsel to Debtors' counsel. TR
188:13-189:5, 191:8-22.

### *Alleged Representations*

51.    On or about May 2002, the Defendant Husband first stated to the Plaintiff that he
owned F.C. Pilgrim when he signed a burglar alarm system contract with the Plaintiff. TR 308:2-
12.

52.    The Defendant Husband stated to the Plaintiff that he owned F.C. Pilgrim in
subsequent conversations during May 2002 at the offices of F.C. Pilgrim, the real property
commonly known as 1037 Chicago Avenue. TR 308:2 – 309:11.

- 12 -

53.    Employees of F.C. Pilgrim were present during these subsequent conversations at the offices of F.C. Pilgrim, and at no time did any individual contradict the statements made by the Defendant Husband regarding his ownership of F.C. Pilgrim. TR 309:12 – 312:23.

54.    On or about January or February 2003, the Defendant Husband stated to the Plaintiff that he was the owner of F.C. Pilgrim in front of numerous F.C. Pilgrim employees and the Defendant Wife at F.C. Pilgrim's offices; and, again no one contradicted the Defendant Husband's statements. TR 313:21 – 314:21.

55.    On or about December 2004, the Defendant Husband stated to the Plaintiff that he was the owner of F.C. Pilgrim during a business meeting with the Plaintiff, Jim Dorsey and Craig Silverman; and, no one contradicted the Defendant Husband's statements. TR 315:6 – 316:18.

56.    On or about December 2004, during a meeting between the Defendant Wife and Plaintiff, the Defendant Wife stated that she and the Defendant Husband had purchased F.C. Pilgrim. TR 365:20-22; TR 366:10-17; TR 366:25 – 367:16.

57.    In 2005 the Defendant Husband used a business card that stated the Defendant Husband was the "Broker/Owner" of "F.C. Pilgrim & Company." PX 75; TR 253:14-25.

58.    On or about January 2005, the Defendant Husband stated to the Plaintiff that he was the owner of F.C. Pilgrim and Pilgrim Management during a meeting with the Plaintiff, Jim Dorsey and April Moon, an employee of F.C. Pilgrim. TR 316:19 – 318:3.

59.    However at no time during or after any of those conversations did Plaintiff ask Debtors for any written representations in connection with the Loan Agreement or written financial statement. He never asked for a written representation that Michael O'Neill owned F.C. Pilgrim & Co. [TR 184:24-185:1, 185:16-19]. The Debtors never provided any representations to

- 13 -

the Plaintiff in connection with the Loan Agreement or in terms of the Loan Agreement. [DX 17;

TR 189:11-15; 191:5-18]  Moreover, the Loan Agreement did not contain any written

representations to Plaintiff, including any representation that Michael O'Neill owned F.C.

Pilgrim & Co. [DX 17; TR 185:12-15, 389:9-12]  Although the Plaintiff testified that on various

occasions beginning in 2002 Michael O'Neill told the Plaintiff that Michael O'Neill owned F.C.

Pilgrim & Co., none of those statements were made in connection with the May 2005 Loan

Agreement or at any time during which the Plaintiff and the Debtors were negotiating the terms

and conditions of the Loan Agreement in April and May 2005.  TR 179:2-4, 180:15-25, 182:17-

25, 183:11-14; 296:6-17, 293:10 – 23, 308:2 – 339:18, 365:20 – 367:16, 370:16 – 371:15.

60(a).  On or about February 2005 a meeting was held at First Bank of Oak Park - a bank

used by the Defendant Husband – where Michael Kelly, the Plaintiff and Defendant Husband

were present, the purpose of which was for the Plaintiff to check the credit references of the

Defendant Husband. TR 321:2 – 322:8; TR 322:23 – 323:6.

60(b).  During the February 2005 meeting, the Defendant Husband stated that he was the

owner of F.C. Pilgrim and that he had a longstanding relationship with the First Bank of Oak

Park as the owner of F.C. Pilgrim and Pilgrim Management, and no one contradicted the

Defendant Husband's statements. [TR 323:7-25].  But, once again, no written financial statement

or representation of his assets was requested or given to Plaintiff.

61.    Plaintiff claims that it was important to him that the Defendant Husband was the

owner of F.C. Pilgrim and Pilgrim Management because it would provide an asset that would

allow the Defendants to repay the money loaned to them by the Plaintiff.  [TR 304:20-305:4].

However, Plaintiff did not ask for a written representation of such ownership, and the weight of

- 14 -

trial evidence established that Plaintiff made the loan with the Debtors in reliance on the interest

obtained by investing in real estate and the personal guarantee rather any statement that Michael

O'Neill owned F.C. Pilgrim & Co.  On various occasions in 2003 and 2004, the Plaintiff

indicated to Michael O'Neill that the Plaintiff was interested in investing in real estate as a

lender. [TR 173:18-174:10, 174:20-175:17, 254:9-255:22, 293:10-17].  On April 19, 2005, the

Plaintiff funded the acquisition of the Humphrey Property in anticipation of executing a loan

agreement with the Debtors at a later date, under which the Debtors would repay the Plaintiff,

with interest, for the purchase price of the Humphrey Property. [TR 180:15-25, 182:17-183:5;

249:14-18; DX 57].  At the time that Plaintiff funded his closing on the Humphrey Property there

was no loan agreement in place with the Debtors, and the parties had not even discussed any

terms and conditions relating to the loan. TR 179:2-4, 180:15-25, 182:17-25, 183:11-14;

296:6-17.

Indeed, not only did Plaintiff not demand any written representations regarding ownership

of F.C. Pilgrim & Co., he did not investigate the F.C. Pilgrim & Co. ownership structure. The

Loan Agreement that the parties executed in May 2005 did not contain any representations to

Plaintiff; there were no representations that Michael O'Neill owned F.C. Pilgrim & Co. [DX 17;

TR. 185:12-15, 389:9-12].  Moreover, the Plaintiff did not request any personal or corporate

financial information or corporate records, and the Plaintiff did not perform any investigation

regarding the asserted "representation" that Michael O'Neill owned F.C. Pilgrim & Co.  TR

185:20-186:22, 187:22 – 188:11, 386:9-13, 387:5 – 389:8.

62.    The Plaintiff contends that he would not have executed the Loan Agreement with

the Defendants without the assurance that the Defendant Husband owned F.C. Pilgrim. [TR

- 15 -

304:9-12; TR 368:23 –369:12], but that contention is contradicted by the evidence. See Finding

No. 61.

### *Default by Defendants*

63.     During 2007, the Defendants failed to make their requisite payments pursuant to

the Second Promissory Note and Third Promissory Note. TR 201:21 – 202:4.

64.     On or about November 21, 2007, the Plaintiff commenced an action against the

Defendants, *et al.*, in the Circuit Court of Cook County, Chancery Division, commonly known as

*Julius J. Rutili v. Michael O'Neill, et al.,* which was assigned Case No. 07 CH 34171 (the

"Circuit Court Case"). PX 37.

65.     On April 27, 2009, the Circuit Court of County entered a Judgment order against

the Defendants and in favor of the Plaintiff (the "Judgment").  PX 37.

66.     Subsequent to April 27, 2009, the Plaintiff commenced post-judgment and

supplementary proceedings related to the Judgment including, but not limited to, citations to

discover assets and garnishment proceedings. TR 59:17 – 60:20; TR 303:9 – 304:2.

67.     No payment was ever made or collected on the Judgment. TR 60:21 – 61:1.

### *Defendants Loss of "Pilgrim" Interests*

68.     In the same year as the Judgment, on December 7, 2009, John O'Neill signed and

caused to be delivered to Defendant Husband and Defendant Wife a Notice of Intended

Disposition of Collateral Pursuant to 810 ILCS 5/9-611 listing John as the Secured Party and

Pilgrim Companies as the Debtor, and the Defendants and Pilgrim Companies as Pledgees of the

collateral. The collateral is defined therein as "(a) 59% interest in all of the issued and

outstanding shares of common stock of Pilgrim Companies, Inc.; (b) 59% interest in all of the

issued and outstanding shares of common stock of Pilgrim Management Company, an Illinois

corporation; and (c) 59% interest in all issued and outstanding shares of common stock (both

voting and non-voting) of F.C. Pilgrim & Co., an Illinois corporation." PX 39; TR 145:22 –

146:2.

     69.    On December 7, 2009, Mary O'Neill executed and caused to be delivered a Notice

of Intended Disposition of Collateral Pursuant to 810 ILCS 5/9-611 listing Margaret as the

Secured Party, and Pilgrim Companies as the Debtor; and, Michael, Mary and Pilgrim

Companies as Pledgees of the collateral. The collateral is defined therein as "(a) 41% interest in

all of the issued and outstanding shares of common stock of Pilgrim Companies, Inc.; (b) 41%

interest in all of the issued and outstanding shares of common stock of Pilgrim Management

Company, an Illinois corporation; and (c) 41% interest in all issued and outstanding shares of

common stock (both voting and non-voting) of F.C. Pilgrim & Co., an Illinois corporation."

PX 40.

     70.    On or about December 18, 2009, John O'Neill and Margaret O'Neill executed a

joint Direction to Escrowee to Transfer Stock Collateral Pursuant to Pledge Agreements and

Escrow Agreements, authorizing and directing Richard W. Burke, Esq., Escrowee under four

Escrow Agreements dated January 3, 2000, to deliver the following to John and Margaret:

        a. 1,000 shares of the common stock of Pilgrim Management;
        b. 1,000 shares of the common voting stock of Pilgrim Companies;
        c. 5,000 shares of the common stock of Pilgrim Companies;
        d. 100 shares of the common stock of F.C. Pilgrim; and,
        e. Assignments regarding the shares set forth in subsections (a)-(d).

PX 41.

## *The Bankruptcy Case Filed by Defendants*

71.    Two months later, on February 20, 2010 (the "Petition Date"), the Defendants

filed their voluntary petition for relief under Chapter 7 of the United Stated Bankruptcy Code

without Schedules and Statement of Financial Affairs and thereby commenced Case No. 10-6832

(the "Bankruptcy Case"). (BK Docket 1). PX 42.

72.    Schedules and the Statement of Financial Affairs are required to be filed within

fifteen (15) days after the date of filing, or in this case by March 7, 2010. 11 U.S.C. § 521.  The

issue presented here lies over the Statement of Financial Affairs ("SFA") that was initially

incomplete.

73.    On March 5, 2010, the Defendants filed a Motion to Extend Time to File

Schedules and Statement of Financial Affairs (the "First Motion to Extend"); and, on March 11,

2010, this Court granted the First Motion to Extend, granting the Defendants leave to file their

Schedules A-J and Statement of Financial Affairs on or before March 18, 2010. (BK Docket 10,

12). PX 43, 44.

74.    On March 18, 2010, the Defendants filed a Second Motion to Extend Time to File

Schedules or Provide Required Information (the "Second Motion to Extend"); and, on March 22,

2010, this Court granted the Second Motion to Extend, granting the Defendants leave to file their

Schedules A-J and Statement of Financial Affairs on or before April 8, 2010. (BK Docket 15,

16).  PX 45, 46.

75.    On March 31, 2010, the Defendants filed Schedules A-J (the "Initial Schedules"),

and Statement of Financial Affairs (the "Initial SFA"). (BK Docket 17).  PX 47, 48.

- 18 -

76.    The Initial Schedules filed on March 31, 2010, did not list any prior or current ownership interest in F.C. Pilgrim, Pilgrim Companies or Pilgrim Management. PX no. 47. However, the Second Amended Statement of Financial Affairs ("Second Amended SFA") filed May 12, 2010, corrected the Debtors' bankruptcy filings. TR 94:13-18 ["THE COURT: By May, he had correct – they had corrected their schedules; isn't that right?  At least to reveal the transactions that you're complaining about? MR. QUAID: Yes, for the first time."]; TR 410:11-19.

77.    The Initial SFA filed did not list ownership or loss of any ownership interest(s) in any business entities for the six years prior to the Petition Date, or any transfer of any interest(s) in any business entities, including F.C. Pilgrim, Pilgrim Companies, and Pilgrim Management. [PX 48].  That is, the SFA filed on March 31, 2010 did not list in Paragraph 4(b) that Michael O'Neill's ownership interests in Pilgrim Companies, Inc., Pilgrim Management Co. or Bonnie Brae Development, LLC had been attached, garnished or seized, so did not disclose the loss of those interests only two months pre-bankruptcy.  But, as Plaintiff conceded at trial, the Second Amended SFA corrected that omission. [TR 94:13-18]  Plaintiff does not contend that the Second Amended SFA was false.

78.    On or before March 31, 2010, the Defendant Husband reviewed each page of the Initial Schedules and signed the Initial Schedules with the Defendants' attorney, Eugene Crane ("Defendant's Attorney"). PX 47; TR 224:13 – 225:1.

79.    The Defendant Husband did not make any changes to the Initial Schedules. TR 224:13 – 225:1.

80.    The Defendant Husband had the opportunity to ask Defendants' Attorney

questions regarding the Initial Schedules. TR 225:16-21; TR 226:18 – 227:11.

81.    The Defendant Husband did not ask the Defendants' Attorney any questions

regarding the Initial Schedules. TR 226:18 – 227:11; TR 228:13-20.

82.    On or before March 31, 2010, the Defendant Husband reviewed each page of the

Initial SFA and signed the Initial SFA with the Defendant's Attorney. PX 48; TR 231: 2-5; TR

231:14-16.

83.    The Defendant Husband did not make any changes to the Initial SFA. TR 231:17-

20.

84.    The Defendant Wife did not sign the Initial Schedules or Initial SFA. PX 47, 48.

85.    The First Meeting of Creditors under Section 341 of the Bankruptcy Code was set

to be held on April 1, 2010, but was continued by the trustee to May 6, 2010. (BK Docket 24).

PX 64.

86.    On April 19, 2010, the Defendants filed Amended Schedules A-J (the "Amended

Schedules") and Amended Statement of Financial Affairs (the "Amended SFA"). (BK Docket

28, 32). PX 49, 50.

87.    The Amended Statement of Affairs did not list the pre-bankruptcy loss of any

ownership interest in any business entities including, but not limited to, F.C. Pilgrim, Pilgrim

Companies or Pilgrim Management.  [PX 49].  That omission was not corrected until the Second

Amended SFA.

88.    The Amended SFA did not list any ownership interest(s) in any business entities

for the six years prior to the Petition Date, or any transfer of any interest(s) in any business

entities including, but not limited to, F.C. Pilgrim, Pilgrim Companies, or Pilgrim Management.

[PX 50]. That omission was not corrected until the Second Amended FSA.

89.     On or before April 19, 2010, the Defendant Husband and Defendant Wife

reviewed and signed the Amended Schedules and Amended SFA. TR 232:5 – 233:1; TR 234:11

– 235:2.

90.     The Defendant Husband and Defendant Wife did not ask Defendants' Attorney

any questions regarding the Amended Schedules or Amended SFA. TR 235:5-13.

### *This Litigation*

91.     On May 4, 2010, two and one-half months after the bankruptcy case filing, the

Plaintiff filed this Adversary Complaint against the Defendants pursuant to 11 U.S.C.

§§ 523(a)(2)(A) and 727(a)(4)(A) and (5) (the "Complaint") that was assigned Case No.

10 A 1084 (the "Instant Case").  (BK Docket 38). PX 51.

92.     On May 6, 2010, a Meeting of Creditors was held and continued by the Trustee

until June 3, 2010 for the Defendants to produce additional documentation. (BK Docket 39). PX

64; TR 62:12-25.

93.     At the May 6, 2010, Meeting of Creditors Timothy Okal, Esq., ("Okal") appeared

as counsel for Plaintiff. TR 61:15-24; TR 62:12-18.

94.     Subsequent to the May 6, 2010, Meeting of Creditors, Okal engaged in numerous

document requests to Defendants' Attorney. PX 52, 54, 55, 58, 60, 62; TR 61:15-24.

95.     On May 12, 2010, Okal sent correspondence to, and which was received by,

Defendants' Attorney demanding production of various documents pertinent to the personal

financial assets and liabilities of the Defendants and several of the Pilgrim Companies. PX 52;

TR 65:14 – 66:5.

96.    Okal did not receive copies of all the documents requested in his May 12, 2010,

correspondence. [TR 66:6-17].  However the Debtors notified Mr. Okal that the Debtors were not

in possession of certain requested documents. DX 44.

97.    On May 21, 2010, the Defendants filed a Second Amended Statement of Financial

Affairs (the "Second Amended SFA"). (BK Docket 43). PX 53.

98.    The Second Amended SFA for the first time listed previously unidentified

information including: (1) the seizure of ownership interests in Pilgrim Companies and Pilgrim

Management on December 18, 2009; (2) the seizure of ownership interests in Bonnie Brae

Development, LLC, on February 16, 2010; and, (3) ownership interests in F.C. Pilgrim, Pilgrim

Companies, Pilgrim Management, and Bonnie Brae Development, LLC, during the six years

prior to the Petition Date. PX 53; TR 239:2-24.

99.    The Defendant Husband selected and paid Defendants' Attorney to represent him

in the Bankruptcy Case. TR 245:20-24.

100.    On June 3, 2010, a Meeting of Creditors was conducted and continued by the

Trustee until July 1, 2010. (BK Docket 46). PX 64.

101.    At the June 3, 2010 Meeting of Creditors Okal repeated his May 12, 2010 request

that the Defendants provide, among other documents, the Acquisition Agreement [Plaintiff's

Group Exhibit 19], and signed documents including escrow agreements and notes. TR 66:18 –

67:24.

- 22 -

102.    On June 24, 2010, Okal sent correspondence to, and which was received by, Defendants' Attorney requesting production of the Acquisition Agreement and executed copies of several documents as described in said correspondence. PX 54.

103.    Okal's June 24, 2010 correspondence related to a June 24, 2010 telephonic conversation Okal had with Defendants' Attorney regarding the previously unproduced Acquisition Agreement and additional signed documents. TR 71:9 – 72:9.

104.    On or about September 2010, the Plaintiff formally served requests for production and interrogatories earlier in May.  TR 75:4-19.

105.    On July 2, 2010, the Meeting of Creditors was continued by the Trustee until August 5, 2010. (BK Docket 51). PX 64.

106.    On or before July 20, 2010, Okal and Defendants' Attorney conducted a telephonic conference during which Okal again requested that Defendants produce the documents requested in his June 24, 2010 correspondence. TR 74:5-19.

107.    On July 20, 2010, Okal sent correspondence to, and which was received by, Defendants' Attorney seeking compliance by the Defendants with the demand for production made by Okal to Defendants' Attorney in Okal's correspondence dated June 24, 2010. PX 55; TR 75:20 – 76:17.

108.    On July 23, 2010, the Defendants filed an Answer to the Complaint (the "Answer"). (Adversary Docket 11). PX 56.

109.    On July 26, 2010, the Defendants filed an Attachment to the Second Amended SFA (the "Attachment to the Second Amended SFA"). (BK Docket 52). PX 57.

- 23 -

110.    On August 5, 2010, the Meeting of Creditors was continued by the Trustee until September 2, 2010. (BK Docket 52). PX 64.

111.    During the August 5, 2010, Meeting of Creditors, Okal's colleague, John Spina, appeared on behalf of the Plaintiff to see if the Defendants would be producing the Acquisition Agreement requested three months earlier in Okal's May 12, 2010 correspondence. The Acquisition Agreement was not produced and John Spina repeated the Plaintiff's May 12, June 24 and July 20, 2010 request for the Acquisition Agreement. [TR 76:22 – 77:13]. Mr. Okal did receive the signed Acquisition Agreement in August 2010.  TR 112:22 – 113:7; DX 48 at p. 1.

112.    On September 3, 2010, the Meeting of Creditors was continued by the Trustee until October 7, 2010. (BK Docket 56).  PX 64.

113.    On September 14, 2010, the Defendants filed an Amended Answer to the Adversary Complaint (the "Amended Answer"). (Adversary Docket 16). PX 59.

114.    On September 30, 2010, the Trustee filed an Initial Report of Assets, and the Clerk of the Court issued a Notice of possible dividend and setting the last date for creditors to file their proofs of claim. (BK Docket 67). PX 64.

115.    On September 30, 2010, Okal sent an email to Defendants' Attorney regarding the timing for the compliance by the Defendants with the demands for the production of documents made by "Plaintiff's First Request for Production" that had been served earlier in September 2010. [PX 60; TR 126:16-20].  Defendants' Attorney responded on September 30, 2010 by email to Okal's message. PX 60; TR 84:5-22.

116.    On or about September 30, 2010, Okal conducted a telephonic conference with Defendants' Attorney and granted Defendants' Attorney an additional one week extension to

- 24 -

produce documents; and, on or about October 8, 2010, Okal received additional documents from

Defendants' Attorney. TR 84:23 – 85:10.

117.   On October 7, 2010, the Trustee concluded the Meeting of Creditors. PX 64.

118.   On October 21, 2010, Okal sent correspondence to, and which was received by,

Defendants' Attorney repeating and reiterating Okal's demand that the Defendants comply with

Okal's First Request for the Production of Documents. PX 62.

119.   Okal did not receive all the documentation that he requested from the Defendants.

[TR 90:14 – 91:12].  However, it has not been demonstrated by Plaintiff that documents that

were requested but not produced would be material to disputed issues in this adversary

proceeding.

120.   On December 23, 2010, the Plaintiff filed Proof of Claim No. 5 against the estate

of the Defendants claiming to be the holder of a $406,057.02 unsecured claim based on the

Second Trust Promissory Note and the Third Promissory Note, together with interest, attorneys

fees and collection charges asserted to constitute a part of the debt owed by the Defendants to

Plaintiff. (Claims Register). PX 63.

121.   The Defendants' failure to satisfy its obligations to the Plaintiff has resulted in a

substantial financial loss to the Plaintiff who has not been repaid in full for the debt due to him.

122.   Facts stated in the Conclusions of Law are deemed to be additional Findings of

Fact.

## CONCLUSIONS OF LAW

### *Jurisdiction and Venue*

1.      Jurisdiction lies here pursuant to Title 28 U.S.C. § 1334 and Internal Operation

Procedure 15 for the Northern District of Illinois.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

### *Introduction*

3.      The bankruptcy system is designed to aid the "honest but unfortunate debtor."

*Grogan v. Garner,* 498 U.S. 279, 286–87 (1991).

4.      A debtor has no fundamental right to a discharge and so does not have a sufficient

interest in a discharge to warrant a heightened standard of proof. *Id.* at 286.

### *Count I Seeks to Bar Discharge*

5.      This Adversary Complaint seeks to bar the Debtors' discharge under

11 U.S.C. § 727(a)(4)(A) and 11 U.S.C. § 727(a)(5). [Adversary Dkt. 1, Adversary Compl. at

¶ 13].

6.      Pursuant to 11 U.S.C. § 727(a) a party must establish grounds for denial of

discharge by proving each required element by a preponderance of the evidence. *In re Scott,* 172

F.3d 959, 966-967 (7th Cir. 1999).

Under that provision, ". . . the court shall grant the debtor a discharge, unless:

(4) the debtor knowingly and fraudulently, in or in connection with the case—
    (A) made a false oath or account;
    (B) presented or used a false claim;
    (C) gave, offered, received, or attempted to obtain money, property, or
    advantage, or a promise of money, property, or advantage, for acting or
    forbearing to act; or

- 26 -

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs; [or]
(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."

### *Count I § 727(a)(4)(A)*

7.      "The purpose of § 727(a)(4) is to ensure that dependable information is supplied to those interested in the administration of the bankruptcy estate so that they can rely upon it without having to make an extraordinary effort to dig out the true facts through examinations or investigations." *In re Hasan*, 245 B.R. 550, 554 (Bankr. N.D. Ill.2000) (citing *In re Carlson*, 231 B.R. 640 (Bankr. N.D. Ill.1999); *In re Syrtveit*, 105 B.R. 596, 596-597 (Bankr. D. Mont.1989)).

8.      "To prevail under section 727(a)(4)(A), an objecting party must establish that (1) the debtor made a statement under oath; (2) the statement was material to the bankruptcy case; (3) the statement was false; (4) the debtor knew the statement was false; and (5) the statement was made with an intent to deceive." *In re Hansen*, 325 B.R. 746, 757 (Bankr. N.D. Ill. 2005). *See also In re Olbur*, 314 B.R. 732, 745 (Bankr. N.D. Ill. 2004); *In re Costello*, 299 B.R. 882, 899 (Bankr. N.D. Ill. 2003); *In re Bostrom*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002); *In re Senese*, 245 B.R. 565, 574 (Bankr. N.D. Ill. 2000).

9.      "To receive a 'fresh start' under the Bankruptcy Code, a debtor must present full and accurate information about himself and his affairs [and] all assets and ownership interests must be disclosed, and all questions in the schedules and statement of financial affairs must be answered completely and honestly." *In re Hansen*, 325 B.R. at 757.

- 27 -

10.     Under § 727(a)(4), a debtor's petition and schedules, statement of financial affairs, and statements made at a meeting of creditors under 11 U.S.C. § 341 constitute statements that are made under oath. *In re Stamat*, 395 B.R. 59, 73 (Bankr. N.D. Ill. 2008); *In re Broholm,* 310 B.R. 864, 879 (Bankr. N.D. Ill. 2004) (citing *In re Bostrom,* 286 B.R. at 359).

11.     The filing of false schedules with material omissions or representations with an intent to mislead creditors as to the debtor's financial condition constitutes a false oath under § 727(a)(4). *In re Stamat*, 395 B.R. at 73.

12.     Debtors must disclose all ownership interests that they hold in property. *In re Costello,* 299 B.R. 882, 899 (Bankr. N.D. Ill. 2003).

13.     "The trustee and creditors are entitled to honest and accurate signposts on the trail showing what property has passed through the debtor's hands during the period prior to his bankruptcy. It is not the debtor's responsibility to decide which assets are to be disclosed to creditors; rather, his job is simply to address each question and answer it accurately and completely." *Id.*

14.     "The cumulative effect of a number of false oaths by the debtor with respect to a variety of matters establishes a pattern of reckless and cavalier disregard for the truth by the debtor." *Id.*

15.     Fraudulent intent may be inferred from circumstantial evidence or by inferences based on a course of conduct. *In re Stamat*, 395 B.R. at 74.

16.     An issue is presented here whether Defendants acted in bad faith or with reckless disregard in filing the Initial Schedules, Initial SFA, Amended Schedules and Amended SFA.

- 28 -

The evidence does show that Debtors assembled and provided documents and information relating to their financial condition and history to their bankruptcy counsel for drafting the bankruptcy filings. [TR 206:11-17, 208:11-17, 217:15-23, 219:23-220:17]. The documents and information that Debtors were required to provide to their bankruptcy counsel for preparing the bankruptcy filings included materials relating to Michael O'Neill's loss of membership interest in Bonnie Brae, and loss of interest in Pilgrim Management Company and Pilgrim Companies, Inc. [TR 207:9-19, 208:20-209:3, 219:23-220:11]. The Debtors testified that they did not intentionally withhold any financial or other information from their bankruptcy counsel in connection with preparing the bankruptcy filings. [TR 209:4-8, 217:15-23, 219:23-220:17, 232:18-234:4, 234:20-235:13]. Counsel for the Debtors drafted the bankruptcy filings. [TR 208:4-19]. The Debtors say they relied on their bankruptcy counsel to prepare the bankruptcy filings completely and accurately from the many records and information supplied to him by them. [TR 209:9-12, 217:15-23, 219:23-220:13, 227:13-25].

The Debtors reviewed their bankruptcy filings for completeness and accuracy before signing and filing the documents. [TR 209:13-212:22, 216:20-23, 232:18-234:4, 234:20-235:13]. Michael O'Neill testified he reviewed every page of the bankruptcy filings before signing. [TR 224:21-23]. The Debtors testified that they were truthful and accurate in reviewing the bankruptcy filings and did not have any intent to withhold information on their bankruptcy filings or otherwise defraud or deceive in connection with the bankruptcy filings. [TR 210:20-212:22, 216:20-23, 219:23-220:17, 232:18-234:4, 234:20-235:13]. The Debtors said that they were not aware of any information that was inaccurate or missing from the bankruptcy filings and believed

- 29 -

the bankruptcy filings to be complete and accurate. [TR 212:15-22, 216:12-23, 219:23-220:17, 228:13-24, 232:18-234:4, 234:20-235:13].

17.    The Initial Schedules, Initial SFA, Amended Schedules and Amended SFA contained omissions regarding the pre-bankruptcy loss of Defendants' assets. However, Debtors argue that the omissions were neither intentional nor material. Assets to which Debtors lost ownership interest prior to the bankruptcy filing, and that were omitted from disclosure in the original bankruptcy filings, had no material impact on the bankruptcy. Bonnie Brae had a negative net worth in February 2010. [TR 427:3-17; DX 33 at p. 58; DX 34]. In 2009, Pilgrim Companies, Inc. and F.C. Pilgrim & Co. reported negative $43,325 in business income. [PX 72 at p. 1]. In 2010, Pilgrim Companies, Inc. and F.C. Pilgrim & Co. reported negative $14,507 in business income. [PX 76 at p. 3].  Moreover, the Plaintiff did not establish value of the assets that were initially not reported, and therefore did not prove materiality as required.

18.    The Schedules and Statements of Financial Affairs were corrected many months before conclusion of the Meeting of Creditors or closing of the case. [Trial Stip. at ¶ 52 & 64; DX 43; PX 53]. The Defendants finally cured the omissions found in the Initial SFA upon the filing of the Attachment to the Second Amended SFA on July 26, 2010, approximately five months after the Petition filing date of February 20, 2010.  Moreover, on May 27, 2010, counsel for the Debtors produced documents and a cover letter to the bankruptcy Trustee Philip Martino and counsel for Plaintiff in follow-up letter to the May 6, 2010 Meeting of Creditors, which included documents explaining the circumstances under which Michael O'Neill had lost his ownership interest in Bonnie Brae, Pilgrim Management Co. and Pilgrim Companies, Inc. before the bankruptcy filing. [Trial Stip. at ¶ 53; DX 44; TR 66:6-12, 259:8 – 260:25].  The documents

- 30 -

produced by counsel for the Debtors on May 27, 2010 included the documents referenced in the

Second Amended SFA as attachments. [Trial Stip. at ¶ 59; TR 259:8 – 260:25].

On July 26, 2010, the Debtors filed Attachments to the Second Amended SFA (the

"Attachments to the Second Amended SFA"). The Attachments to the Second Amended SFA

were documents explaining the circumstances under which Michael O'Neill had lost his

ownership interest in Bonnie Brae, Pilgrim Management Co. and Pilgrim Companies, Inc. before

the bankruptcy filing. These same documents had been produced to the Trustee and counsel for

the Plaintiff on May 27, 2010. [Trial Stip. at ¶ 59; DX 44; DX 47; PX 57].

19.    The Defendants did not cure the defects in the Initial SFA until after the filing of

the Complaint in the Instant Case. The Second Amended SFA was filed after the Adversary

Complaint was filed. However, that Complaint was filed only two and one-half months after the

bankruptcy case was filed and cannot be considered the only reason why the correction was made

in the Second Amended SFA. The Debtors claim that they were not aware that there was a

mistake with the previous bankruptcy filing that required the Second Amended SFA until their

bankruptcy counsel notified them and provided an explanation. [TR 212:4-13, 214:4-15, 216:4-

19, 226:12-17, 239:2-12, 243:5-11]. It must be noted that the bankruptcy schedules and SFA

require a great amount of information on particular forms and it is not unusual for debtors in

bankruptcy to make some mistakes that require correction. Not all omissions or mistakes show

fraudulent intent to hide assets. A judgment to bar discharge or dischargeability or debt places a

heavy burden on debtors. An error or omission that has no consequence to the bankruptcy estate

may be, but is not always, the product of fraudulent intent. The key to whether fraud occurs is

usually the question whether the error or omission is "material," which usually means whether it

has hidden something valuable from the Chapter 7 Trustee. As discussed below, that did not

happen here because the initial omission neither hid valuable assets nor impeded the Trustee and

so was not "material" as the statute requires.

20.     The Defendants did not properly amend their Initial SFA and Amended SFA until

the Plaintiff demanded that Defendants produce information relating to their ownership interests

in F.C. Pilgrim, Pilgrim Companies, Pilgrim Management, and Bonnie Brae Development, LLC.

The Debtors said they were not aware that there was an omission with the previous bankruptcy

filing that required the Second Amended SFA until explanation by their counsel. [TR 212:4-13,

214:4-15, 216:4-19, 226:12-17, 239:2-12, 243:5-11].

21.     The Defendant Husband is an educated businessman who reviewed every page of

the Initial Schedules and Initial SFA and failed to disclose the business ownership interests lost

pre-bankruptcy that he had held within six years prior to the bankruptcy filing.

22.     Plaintiff asserts that both Defendants should be denied a discharge because the

Defendants have failed to demonstrate that they acted in good faith in conducting their affairs

and filing their Initial SFA and Amended SFA until filing their Second Amended SFA.

23.     Plaintiff argues that Defendants' amendments, including the final accurate

amended filing, would not have been made if not for the Plaintiff's persistent efforts to obtain the

information finally revealed.

24.     The Defendants' delay in filing their final complete and accurate Second

Amended Statement of Financial Affairs to about five months after bankruptcy filing

demonstrated careless reading of their earlier SFA filings, failure to read fully and carefully the

requirements therein, and then to disclose all required details of their financial matters and

history. But there are two questions in that regard. First, whether the initial omissions were

intentional and fraudulent, and second, whether they were material. For reasons stated below, it

is concluded that they were neither intended and fraudulent nor material.

### *The Debtors Did Not Knowingly Or With*
### *Reckless Disregard Make A False Statement*

25(a).   The Debtors' Initial and Amended SFA did not identify Michael O'Neill's pre-

petition loss of his ownership interests in Pilgrim Companies, Inc., Pilgrim Management

Company and Bonnie Brae as required in the look-back provision of Paragraph 4(b) of the SFA

form. However, the trial evidence established that this omission was not done intentionally and

the Debtors did not act with reckless disregard. The evidence showed that Debtors assembled and

provided detailed documents and information relating to their financial condition to their

bankruptcy counsel for preparation of the Schedules and SFA. [TR 206:11-17, 208:11-17,

217:15-23, 219:23-220:17]. The documents and information the Debtors provided to their

bankruptcy counsel included documents showing the loss of membership interest in Bonnie Brae,

and loss of interest in Pilgrim Management Company and Pilgrim Companies, Inc. [TR 207:9-

19, 208:20-209:3, 219:23-220:11]. The Debtors relied on their bankruptcy counsel to prepare the

bankruptcy filings completely and accurately from records they supplied to them. [TR 209:9-12,

217:15-23, 219:23-220:13, 227:13-25]. It is not found or concluded that the Debtors

intentionally withheld any financial or other information from their bankruptcy counsel in

connection with preparing the bankruptcy filings. [TR 209:4-8, 217:15-23, 219:23-220:17,

232:18-234:4, 234:20-235:13].

The trial evidence also demonstrated that the Debtors reviewed their bankruptcy filings for completeness and accuracy before signing and filing the documents. [TR 209:13-212:22, 216:20-23, 232:18-234:4, 234:20-235:13]. Michael O'Neill testified he reviewed every page of the bankruptcy filings before signing. [TR 224:21-23]. The Debtors did not have any motive to withhold the omitted information on their bankruptcy filings, or otherwise to defraud or deceive anyone in connection with the bankruptcy filings. [TR 210:20-212:22, 216:20-23, 219:23-220:17, 232:18-234:4, 234:20-235:13]. The Debtors were careless with regard to the historical pre-bankruptcy information that initially was inaccurate or missing from the SFA but believed in good faith that their otherwise detailed bankruptcy filings were complete and accurate. TR 212:15-22, 216:12-23, 219:23-220:17, 228:13-24, 232:18-234:4, 234:20-235:13]. On April 19, 2010, the Debtors filed the Amended Schedules and the Amended SFA. [Trial Stip. at ¶ 46; DX 39 – 40; PX 49 – 50]. The Amended Schedules and Amended SFA added the Debtor Wife's signature and were otherwise the same as the original filings. The Debtors reviewed the Amended Schedules and Amended SFA before signing and filing. [TR 212:23-213:21, 232:5-12, 232:18-234:4, 234:20-235:13].

The Debtors' conduct in filing the Second Amended SFA after omissions were identified in the earlier Amended SFA demonstrates the Debtors were not knowingly filing false pleadings or acting with reckless disregard. On May 6, 2010, a Meeting of Creditors was held and attended by Plaintiff and counsel for Plaintiff, Debtors and counsel for Debtors, and the Trustee Phillip Martino. Debtors' ownership interest in various properties and businesses, including the Pilgrim entities and Bonnie Brae, were discussed at this meeting. [Trial Stip. at ¶ 49; DX 52; PX 64; TR 213:22-214:3]. This meeting alerted counsel for the Debtors that information regarding Michael

- 34 -

O'Neill's loss of these business assets had not been included in response to Paragraph 4(b) of the

Original or Amended SFA. [TR 212:4-13, 214:4-15, 216:4-19, 226:12-17, 239:2-12, 243:5-11].

On May 21, 2010, before conclusion of the Meeting of Creditors, the Debtors filed the

Second Amended SFA. [Trial Stip. at ¶ 52; DX 43; PX 53]. The Second Amended SFA

explained that Debtor Michael O'Neill had lost his ownership interest in Bonnie Brae, Pilgrim

Management Co. and Pilgrim Companies, Inc. before the bankruptcy filing, and the

circumstances under which Michael O'Neill lost the ownership interests, by stating: "On or about

12/18/09, Michael O'Neill's interest in Pilgrim Management Co and Pilgrim Co.'s Inc. were

forfeited pursuant to a disposition of collateral pursuant to 810 5/9-611"; and "On or about

2/16/10, Michael O'Neill's interest in Bonnie Brae Development, LLC was terminated". [Trial

Stip. at ¶ 52; DX 43 at ¶ 4 (p. 4); PX 53]. The Debtors' bankruptcy counsel prepared the Second

Amended SFA and the Debtors reviewed the Second Amended SFA to make sure it was

complete and accurate before signing and filing it. The Debtors were not aware that there was a

mistake with the previous answers to the SFA that required the Second Amended SFA until their

bankruptcy counsel notified them and provided an explanation. [TR 212:4-13, 214:4-15, 216:4-

19, 226:12-17, 239:2-12, 243:5-11]. Plaintiff conceded at trial that the Second Amended SFA

corrected the Debtors' bankruptcy filings. [TR 94:13-18, "THE COURT: Listen, I'm still trying

to figure out the relevance here. By May, he had correct – they had corrected their schedules;

isn't that right? At least to reveal the transactions that you're complaining about. MR. QUAID:

Yes, for the first time."; TR 410:11-19]. Moreover, the Second Amended SFA was filed before

the Trustee concluded the Meeting of Creditors on October 7, 2010. [Trial Stip. at ¶ 64; DX 52;

PX 64].

### *The Debtors Did not Have an Intent To*
### *Defraud In Connection With Their Bankruptcy Filings*

25(b).  The trial evidence established that the Debtors lacked fraudulent intent. Instead,

the evidence established that the Debtors made an honest mistake in the Initial and Amended

SFA.[1]  "A discharge cannot be denied when items are omitted from the schedules by honest

mistake." *Beaubouef v. Beaubouef (In re Beaubouef),* 966 F.2d 174, 178 (5th Cir. 1992); *Bank of*

*Homewood v. Rossi,* 1986 WL 8503, *5 (N.D. Ill. 1986). The honest mistake resulted from the

Debtors providing voluminous information and documents to their bankruptcy counsel in

reliance on counsel to completely and accurately complete the SFA and then reviewing the SFA

and Amended SFA without sufficient care for their completeness.[2]

The Debtors' lack of fraudulent intent was also evidenced by their filing of the Second

Amended SFA shortly after they were alerted by their bankruptcy counsel that the Initial and

Amended SFA was not complete, and that the Second Amended SFA was filed before

termination of the Meeting of Creditors.  A debtor who mistakenly or inadvertently provides

false information or fails to disclose pertinent information and takes steps to amend his filings to

---

[1] It is undisputed that the Debtor Wife did not sign the Initial SFA, and the Plaintiff did not even attempt to introduce any evidence that the Debtor Wife intended to defraud with respect to Michael O'Neill's loss of business assets. Plaintiff must establish the elements of 11 U.S.C. Section 727(a)(4)(A) against both Debtors, and more than marital relationship is necessary to impute fraudulent intent between debtor spouses. *Cole Taylor Bank v. Yonkers (In re Yonkers),* 219 B.R. 227, 233 (Bankr. N.D. Ill. 1997); *In re Cooper,* 399 B.R. 637, 649 (Bankr. E.D. Ark. 2009).

[2] *In re Radloff,* 418 B.R. 316, 326 (Bankr. D. Minn. 2009) ("the Debtor's reliance in fact on counsel to complete the form in a way responsive to the statutory requirements bolsters a finding of no knowledge or fraudulent intent on the Debtor's part.").

correct them prior to conclusion of the Meeting of Creditors does not possess the requisite

fraudulent intent to deny discharge under § 727(a)(4)(A).[3]

Plaintiff's Post-Trial Brief contends that the Debtors hid Michael O'Neill's loss of

business ownership assets in order to re-acquire the assets from his father through a "testimonial

transfer" (i.e. a parental will). [Adversary Dkt. 95 at p. 8]. Plaintiff's post-trial argument was first

raised in his Post-Trial Brief was not supported by evidence at trial. This suggestion of a

conspiracy between the parents and Defendants is speculative. Moreover, the argument is

defeated by Plaintiff's own admissions at trial that the Second Amended SFA was accurate and

corrected the Debtors' bankruptcy filings. [TR 94:13-18, 410:25 – 411:4 - "THE COURT:

Counsel, do you contend that the final iteration of the schedules was false?" MR. QUAID: "No,

that it was too late, and that it was a part of a plan to try to throw people off the track.";

TR 411:19 – 25, "THE COURT: You have not demonstrated from the evidence that it was – a

final iteration of the schedules was false, have you? MR. QUAID: "I have not."] The Plaintiff did

---

[3] *In re O'Neal*, 436 B.R. 545 (Bankr. N.D. Ill. 2010) (holding following trial that adversary
defendant should not be denied discharge under 11 U.S.C § 727(a)(4) where asserted false statements
under oath did not show intent to defraud or reckless indifference, and were corrected); *In re Oliver*, 414
B.R. 361, 374-75 (Bankr. E.D. Tenn. 2009); *In re Larrieu*, 230 B.R. 256, 270-271 (Bankr. E.D. Pa. 1999)
(Debtor voluntarily amended schedules after learning of error, and Court found no intent to defraud); *In
re Carter*, 203 B.R. 697, 707 (Bankr. W.D. Mo. 1996) ("While debtors' original schedules contain some
inaccuracies and omissions, debtors did file corrected schedules after the case was converted to Chapter
7. In light of those corrections, I cannot find that Darin knowingly and fraudulently lied when he signed
his bankruptcy schedules."); *In re Merena*, 413 B.R. 792, 816-817 (Bankr. D. Mont. 2009); *In re Burzee*,
402 B.R. 8, 18 (Bankr. M.D. Fla. 2008) ("The Debtor did not fraudulently omit information from her
schedules and statements. She unintentionally omitted information relating to her USAA Rollover
Account through inadvertence. Her disclosure regarding the April 21, 2004 Rogel transfers was
imprecise, but she disclosed the transfers. She remedied the omission and imprecision in her amended
schedules immediately after engaging new counsel. She fully cooperated with the Trustee and provided
to him detailed information early on in her Chapter 7 proceedings. The Debtor did not knowingly and
fraudulently make a false oath or account. The Plaintiff has failed to establish the elements of 11 U.S.C.
Section 727(a)(4)(A).")

not challenge by trial evidence or separate litigation asserting fraudulent transfer under § 546 of

the Code the legitimacy of the transactions identified in the Second Amended SFA by which

Defendants lost the assets in issue before the bankruptcy was filed.  He might have done so either

with leave of court or by the Trustee abandoning such claim.[4]  Plaintiff's arguments now

challenging those transactions indirectly are not substitute for such litigation or a basis for

holding them invalid.  Plaintiff's post-trial motion (discussed below) to withdraw one stipulation

because another stipulation is said to show that the cancellation of Defendants' rights in

"Pilgrim" interests might have been arguably premature falls far short of an action or evidence to

show that transaction was improper.  Moreover, the lack of proof that the information initially

omitted did not hide assets of any value to the bankruptcy estate or its administration shows that

Defendants had no motive to hide that information.

The Plaintiff's failure to establish the existence of the requisite intent alone warrants a

denial of the objection to discharge brought under § 727(a)(4)(A).

---

[4] The implication of Plaintiff's argument is that the transfer of interests that deprived Debtors of the interests in question might be avoidable under 11 U.S.C. § 548 as a transfer in fraud of creditors. A creditor who wishes to pursue such an action that a Chapter 7 trustee does not wish to pursue may either ask the trustee to abandon the claim so the creditor may pursue it for his own benefit, or petition the court to allow him to bring the claim on behalf of the bankruptcy estate.

A creditor's standing to pursue a § 548 action on behalf of the estate requires court permission where the trustee unreasonably declines to bring it. *Fogel v. Zell*, 221 F.3d 955, 966 (7th Cir. 2002) or where the trustee consents. *Housecraft Indus. V. Myrad*, 310 F.3d 64, 70-71 (2d Cir. 2002).

If the trustee abandons such a claim either willingly or is ordered to do so an individual creditor may pursue such a claim for his own benefit, not derivatively is described above. *Collier on Bankruptcy*, P. 548.02 (citing *Blumenberg v. Yihye*, 263 B.R. 704 (Bankr. E.D.N.Y. 2001)). If such a fraudulent conveyance claim is property of the estate but abandoned under § 554 then the right to pursue it reverts back to the pre-bankruptcy creditor who originally held the claim. *Id.*

- 38 -

### *Plaintiff's Post-Trial Motion to Amend Joint Trial Stipulation*

As part of the effort to buttress his suggestion that the transfer of interests was a

fraudulent scheme, Plaintiff moved post-trial to amend one of the Joint Trial Stipulations entered

into pretrial and not questioned during the trial.

Many months after conclusion of trial and the close of evidence, the Plaintiff

now moves to "correct" the Joint Trial Stipulations (Adversary Dkt. 105) by deleting Paragraph

21, in which the parties stipulated to the following facts:

> 21.    Pilgrim Companies, Inc.'s last monthly payment to John O'Neill and
> Margaret T. O'Neill under the Installment Notes was made on April 2,
> 2009. Pilgrim Companies, Inc. did not make the scheduled payments under
> the Installment Notes for May 2009 through November 2009.

The Plaintiff's motion is untimely and is an improper attempt to re-open the proofs and

re-argue the evidence in the case. Despite having the opportunity to do so, the Plaintiff failed in

all respects to introduce any evidence at trial challenging the validity of the underlying

foreclosure transactions identified in the Debtors' Second Amended Statement of Financial

Affairs. The instant Motion is a belated and improper attempt to re-open the

evidence to introduce arguments challenging the underlying foreclosure transactions by

contending for the first time that there were no missed payments to justify foreclosure of Debtor

Michael O'Neill's ownership interest in the Pilgrim Companies, Inc. and Pilgrim Management

Company. However, the close of evidence has long since passed and the Debtors structured their

arguments and evidence based on the Joint Trial Stipulations and the evidence actually

introduced at trial.

The Motion also has no basis substantively because the Plaintiff made no challenge to

Paragraph 21 of the Joint Trial Stipulations throughout the trial by failing to introduce any

evidence to challenge the stock foreclosure and by indicating to this Court and Debtors that

Plaintiff was instead limiting his case in Count I to the lack of disclosures in the Debtors' Initial

and Amended Statement of Financial Affairs. The Motion is furthermore belied by the factual

record, including the trial testimony and the trial exhibit attached to the Motion itself.  For these

reasons, the Motion should be denied.

### *The Motion Is Untimely and Improper*

It is a "well settled rule" that a stipulation of fact that is fairly entered into is controlling

and conclusive on the parties and this Court is bound to enforce it. *Illinois Cent. Gulf R. Co. v.*

*Tabor Grain Co.*, 488 F. Supp. 110, 122 (N.D. Ill. 1980). The trial stipulation at issue in the

motion before this Court is purely factual, and involves whether payments were or were not

made. Therefore, the stipulation is controlling and conclusive and this Court is bound to enforce

it.

The Plaintiff has not contended that he did not freely enter into the Joint Trial

Stipulations. The Plaintiff deposed the Debtor Michael O'Neill and his father John O'Neill (one

of the persons that foreclosed on the stock). Moreover, the Plaintiff had a full and complete

opportunity to examine the document productions and trial exhibits, including the Debtors' Trial

Exhibit 12, before entering into the Joint Trial Stipulations. Having taken the depositions and

reviewed the documents, the Plaintiff agreed to the Joint Trial Stipulations and they were filed on

April 18, 2011 on the first day of trial (Adversary Dkt. 85).  The Joint Trial Stipulations were

also filed without objection a second time by both parties on July 15, 2011 to add citations to the

- 40 -

trial exhibits (Adversary Dkt. 104). The Debtors, in turn, reasonably relied on the Joint Trial

Stipulations in evaluating and presenting their case [*See* TR 404:17-405:7 & 414:1-5] reflecting

the understanding of counsel for Debtors that the Plaintiff had stipulated to the basis for the stock

foreclosure). It is clearly untimely and improper for the Plaintiff to attempt to strike a factual

stipulation nearly eight months after the end of trial and close of evidence.

### *The Contentions of a "Mistake" are not Supported*

Plaintiff's argument in support of his Motion rests on another Exhibit admitted into

evidence, Defendants' Trial Exhibit 12. Trial Exhibit 12 is said by Plaintiff to show the "[s]tatus

of Accounts purporting to show what payments, were, in fact, actually made or were not made

that were due from Pilgrims Companies, Inc. and Michael O'Neill to his father (John O'Neill)

and mother (Margaret T. O'Neill) pursuant to the Installment Notes given as the purchase price

for the purported purchase of the stock of Pilgrim's Companies, Inc., including, F.C. Pilgrim, by

Michael O'Neill and his sister from his father and mother." Plaintiff argues that Defendants'

Trial Exhibit 12 contradicts Paragraph 21 of the Joint Trial Stipulations in that it shows "that the

scheduled payments due under the promissory note were, in fact, made beyond April, 2009, and

were made through November, 2009, for the note to John O'Neill (Page 2) and through October,

2009, for Margaret O'Neill . . . ."

The Plaintiff claims in the Motion that the factual stipulation in Paragraph 21 of the Joint

Trial Stipulations is "most likely a mutual mistake of fact", as Trial Exhibit 12 "contradicts"

Paragraph 21 of the Joint Trial Stipulations (Adversary Dkt. 105 ¶¶ 3 & 9). However, Trial

Exhibit 12 could be read to show that payments were not made for the time period May 2009

through November 2009, as stated in Paragraph 21 of the Joint Trial Stipulations. Moreover, the

portions relied upon by the Plaintiff as purporting to show that payments were made do not

identify the "Payee" and do not provide check numbers for the alleged payments in the

"Refer[ence]" column (*See* Tr. Ex. 12, p. 3, 9.) These missing pieces of information were

provided for all other payment entries from earlier time periods covered by Trial Exhibit 12 when

payments were actually made. The absence of this information in the entries on Trial Exhibit 12

relied upon by the Plaintiff calls into question the Plaintiff's new contention that the requisite

payments were in fact made. Had the Plaintiff asserted his challenges to Paragraph 21 of the

Joint Trial Stipulations in a timely manner at trial, the accuracy of the entries on Trial Exhibit 12

could have been investigated at trial. Moreover, the undisputed trial testimony established that

Pilgrim Companies, Inc. failed to make all required payments [TR 146:14-16]. Therefore, the

contention upon which the Plaintiff's motion is based (that Trial Exhibit 12 "contradicts"

Paragraph 21 of the Joint Trial Stipulations) is unsupported by the evidence admitted at trial.

### *The Stock Foreclosure Was Not Material*

The Plaintiff argues that striking Paragraph 21 would be significant because the failure to

make the payments at issue in Paragraph 21 was the alleged basis for foreclosure on the stock

held in escrow as collateral for the Notes, and if the payments were in fact made then the

foreclosure was "improper and therefore, void." (Adversary Dkt. 105, p. 4 at ¶ 4.) However, the

Plaintiff never introduced at trial any evidence regarding the purported value of the stock that

was foreclosed upon, and therefore has not articulated how striking Paragraph 21 of the Joint

Trial Stipulations could support his positions. For example, the Plaintiff did not provide any

expert testimony on valuation, or even attempt to introduce evidence regarding the purported fair

market value of the stock. Therefore, there is no basis in the record or this Court to find that any

material information was not disclosed on the Debtor's SFA. "A claim or statement is material if
it hinders the administration of the estate." *In re Agnew,* 818 F.2d 1284, 1290 (7th Cir.1987)
(holding materiality element not satisfied under § 727(a)(4) where proceeds from sale of asset
subject to false oath could not have been reached by creditors to satisfy debts); *In re Calisoff,* 92
B.R. 346, 355 (Bankr. N.D. Ill. 1988). The trial evidence, including the Trustee's filing of a no-
asset report in January 2011 failed to show that the stock that was foreclosed upon in Pilgrim
Companies, Inc., Pilgrim Management Company and F.C. Pilgrim & Co. had sufficient material
value to pursue. (Trial Stip. at ¶ 67 ("On January 5, 2011, the bankruptcy trustee filed a no-asset
report"); PX 72 at p. 1 (showing that in 2009, Pilgrim Companies, Inc. and F.C. Pilgrim & Co.
reported negative $43,325 in business income); PX 76 at p. 3 (in 2010, Pilgrim Companies, Inc.
and F.C. Pilgrim & Co. reported negative $14,507 in business income)).

### *The Motion Seeks to Elevate Argument to the Status of Evidence*

Plaintiff contends that the continuation of the payments beyond the April, 2009 date,
stated in the Joint Trial Stipulations to and through October, 2009 and November, 2009
respectively, supports the Plaintiff's theory of the case that Michael O'Neill had a very concrete
motive in concealing the alleged foreclosure of his ownership interest in the stock of Pilgrim's
Companies, Inc., from his Chapter 7 Trustee and the inquiring creditors, including and especially,
the Plaintiff. Combined with the fact that Michael O'Neill's father and mother were by contract
to honor a ninety (90) day cure period for any failure of monetary payments due under the
promissory note from Pilgrim Companies, Inc., and its guarantors, Michael O'Neill and his
sister, foreclosure under the Uniform Commercial Code of the stock interests of Michael O'Neill
and his sister is said now by Plaintiff to have been improper and therefore, void. The

- 43 -

continuation of the monetary payments through October and November 2009 did not permit a

foreclosure on December 6, 2009, due to the need to give the ninety (90) day cure." [Plaintiff

Reply Brief 4.]

Arguing further, Plaintiff's Reply Brief states that "[if] the October and November, 2009,

dates are correct for the last payments made on the Installment Notes, then the ninety (90) day

cure period would have delayed any foreclosure action until March, 2010." [*Id.* at 4.] Then,

without the having of any witness being offered to interpret Exhibit 12 Plaintiff gives his own

interpretation.

> On page 3 of the Defendants' Trial Exhibit 12, payments are shown to be made to
> Michael O'Neill's father through November 13, 2009. On page 5 of the same
> document, the last line shows a payment to Michael O'Neill's mother on October 15,
> 2009. Therefore, these later dates contradict paragraph number 21 of the Joint Trial
> Stipulations and in the interest of manifest justice, must be corrected.

That interpretation merely represents Plaintiff's opinion concerning a document about

which no witness familiar with it has testified.

### *Standards for Allowing Withdrawal of Stipulations*

The Plaintiff argues that two grounds exist warranting the court to "correct" the Joint

Trial Stipulations in Paragraph 21, either on the grounds that the dates therein "constitute mutual

mistake of facts on the part of the Plaintiff and Defendants or to serve manifest justice."

It is true that an initial mistake of fact in a stipulation can be corrected if that be

demonstrated. *Whitaker v. Associated Credit Services, Inc.*, 946 F.2d 1222, 20 Fed R. Serv. 3d

1275 (6th Cir. 1991); *In re Martinez*, 393 B.R. 27, 32–33 (D. Nev. 2008). Also, it has been held

that a stipulation alone does not prevent a court from reviewing what may be a "manifest"

injustice. *Metro Tech Service Corp. v. Payless Shoe Source, Inc.*, 2007 WL 2003039, *3 (7th Cir.

- 44 -

2007) A court has the power to relieve a party from a stipulation if the facts show that it is

reasonable to do so. *Id.* at 3 (citing *Cates v. Morgan Portable Building Corp.*, 780 F.2d 683 (7th

Cir.1985)).

But otherwise, stipulations entered into freely and fairly are not to be set aside except to

avoid manifest injustice. *Fairway Const. Co. v. Allstate Modernization, Inc.*, 495 F.2d 1077,

1079 (6th Cir.1974) (citing *Sherman v. U.S.*, 462 F.2d 577 (5th Cir. 1972); *Fenix v. Finch*, 436

F.2d 831 (8th Cir. 1971)).

Courts have been unwilling to set aside stipulations where the court determines that a

stipulation was freely and fairly entered into and manifest injustice did not arise. *Id.*

A party's pre-trial stipulation is binding "unless relief from the stipulation is necessary to

prevent a 'manifest injustice' or the stipulation was entered into through inadvertence or based

on an erroneous view of the facts or law." *In re Ebro Foods*, 449 B.R. 759, 764 (7th Cir.2011)

(citing *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1206 (7th Cir.1989) (citation

omitted)). "As with other matters of trial management, the [trial] court has 'broad discretion' to

decide whether to hold a party to its stipulations; the [trial] court's decision will be overturned on

appeal only where the court has clearly and unmistakably abused its discretion." *Id.*

Grounds for relieving a party from a stipulation are that it was entered into as a result of

fraud, misrepresentation, mistake of fact, or excusable neglect, or that the facts have changed, or

that there is some other special circumstance rendering it unjust to enforce the stipulation; the

fact that the party has changed attorneys is not such a circumstance. *People v. Trujillo,* 136 Cal.

Rptr. 672, 67 Cal. App.3d 547 (Ca. App. 1977).

- 45 -

"Under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court." *PPX Enters., Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 123 (2d Cir.1984) (citation omitted). A court may also disregard a stipulation "if it would be manifestly unjust to enforce the stipulation,"or "the evidence contrary to the stipulation is substantial." *Id.*; *In re West Pan, Inc.* 372 B.R. 112, 122 (S.D.N.Y. 2007).

In this case, the effort to amend or avoid Paragraph 21 of the Stipulation as it reads is not warranted by any of the exceptions to the rule of law that enforces stipulations freely entered into. Plaintiff's Motion to do so rests entirely on his lawyer's interpretation of another stipulated statement that no witness has interpreted or testified about. Plaintiff thereby seeks by his interpretation, and argument based on it, to expand the trial record long after both parties rested and the trial record was closed. He thereby seeks to introduce new meaning to the evidence post-trial that he reads into another stipulation, a supposed meaning argued without introducing a witness to interpret the document and without allowing Defendants an opportunity to rebut Plaintiff's interpretation by evidence at trial.

Therefore, Plaintiff Motion will by separate order be denied.

### *Omission of Information From The Initial And First Amended SFA Did Not Have a Material Effect on Property or Administration of the Bankruptcy Estate*

25(c). "A claim or statement is material if it hinders the administration of the estate." *In re Calisoff,* 92 B.R. 346, 355 (Bankr. N.D. Ill. 1988); *In re Agnew,* 818 F.2d 1284, 1290 (7th Cir.1987) (holding materiality element not satisfied under § 727(a)(4) where proceeds from sale of asset subject to false oath could not have been reached by creditors to satisfy debts). The omissions at issue in this case were not material for a number of reasons. First, they were

corrected long before conclusion of the Meeting of Creditors so that potential recovery of assets

was not jeopardized.[5] Second, the trial evidence, including the Trustee's filing of a no-asset

report in January 2011, demonstrated that the assets were not recoverable and, even if they were

recoverable, did not have value to pursue. [Trial Stip. at ¶ 67; DX 52; PX 64; PX 72 at

p. 1 (in 2009, Pilgrim Companies, Inc. and F.C. Pilgrim & Co. reported negative $43,325 in

business income); PX 76 at p. 3 (in 2010, Pilgrim Companies, Inc. and F.C. Pilgrim & Co.

reported negative $14,507 in business income); TR 427:3-17 (Bonnie Brae had a

negative net worth in February 2010)]. No evidence of value of the lost assets as of the date of

bankruptcy filing was offered.

For lack of materiality of the initial omission, the action under § 727(a)(4) also fails.

### Count I § 727(a)(5)

26.      In furtherance of §727(a)(5), "for purposes of determining whether the debtor's

discharge should be denied for failing to explain the absence of assets, the debtor's explanations

must consist of more than vague, indefinite, and uncorroborated reasons. To be satisfactory, the

explanation must demonstrate that debtor has exhibited good faith in conducting his affairs and

---

[5] The Plaintiff argues that the Debtors did not produce necessary documents in the bankruptcy and the adversary proceeding. [Adversary Dkt. 95 at p. 9]. These arguments are belied by the Plaintiff's failure to subpoena or even attempt to contact Bonnie Brae or the Pilgrim entities to obtain the documents, the Plaintiff's failure to file any motion to compel against the Debtors, Mr. Okal's testimony that he was receiving documents from the Debtors continuously from May 2010 through October 2010 when he was substituted as counsel for the Plaintiff, and Michael O'Neill's unrebutted testimony that the Debtors diligently searched for and produced boxes of documents that were requested. [See Debtors' FOF and COL; TR at 90:14-91:12, 104:2-14, 106:16-107:11, 113:10-14, 115:8-117:2, 117:21-23, 220:18-221:16, 235:14-236:14, 237:9-238:18; DX 44; Trial Stip. at ¶ 59]. Moreover, the Plaintiff's argument that the Debtors were attempting to conceal the loss of assets by not turning over requested documents is without merit. Disclosures in the Second Amended SFA, and documents filed with the Court and turned over in discovery substantiating the disclosures, demonstrate that the Debtors were not attempting to conceal Michael O'Neill's pre-bankruptcy loss of business ownership assets.

explaining loss of assets." *In re Hasan*, 245 B.R. 550, 554 (Bankr. N.D. Ill. 2000) (citing *In re Bryson*, 187 B.R. 939, 956 (Bankr. N.D. Ill.1995)).

27.    Once the party objecting to discharge presents evidence of the disappearance of substantial assets, the burden then shifts to the debtors to explain those losses. *Id* at 554-5 (citing *In re Volpert*, 1994 WL 605894 (Bankr. N.D. Ill.1994)); *In re Potter*, 88 B.R. 843, 849 (Bankr.. N.D. Ill.1988); *In re Martin*, 141 B.R. 986, 999 (Bankr. N.D. Ill. 1992).

28.    Under §727(a)(5) proof comes in two stages, the first of which is that the Plaintiff bears the burden of demonstrating that the Defendants "at one time owned substantial and identifiable assets that are no longer available to [their] creditors." *In re Stamat*, 395 B.R. 59, 73 (Bankr. N.D. Ill. 2008) (citing *In re Olbur*, 314 B.R. 732, 740 (Bankr. N.D. Ill. 2004) (quoting *In re Bostrom*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002)); *In re Hermanson*, 273 B.R. 538, 545 (Bankr. N.D. Ill. 2002).

29.    Once the Plaintiff makes such showing, the Defendants then have the burden to offer a "satisfactory explanation" for the unavailability of those assets, and it is in the court's discretion to determine whether the explanation is satisfactory. *In re Stamat*, 395 B.R. at 76.

30.    By penalizing a debtor who is insufficiently forthcoming about what happened to his assets, §727(a)(5) is designed to "relieve creditors and courts of the full burden of reconstructing the debtor's financial history and condition, placing it instead upon the debtor." *In re Hansen*, 325 B.R. 751, 757 (Bankr. S.D.S.C. 2006) (citing *In re Hermanson*, 273 B.R. at 553).

31.    Under § 727(a)(5), the bankruptcy judge has "broad power to decline to grant a discharge...where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996).

32.    The bankruptcy judge is not concerned with wisdom of the debtor's disposition of

their assets and income but rather focuses on "the completeness and truth of the debtor's

explanation." *In re Stamat*, 395 B.R. at 76; *In re Costello,* 299 B.R. at 901.

33.    Based on Conclusions earlier discussed, it was held and found that Defendants did

not act in bad faith in filing the Initial Schedules, Initial SFA, Amended Schedules or Amended

SFA.

34.    The Defendants' signatures on their Initial SFA and Amended SFA demonstrate

that they were careless in reading their initial filings that omitted disclosure of assets lost before

their bankruptcy filing, but did not knowingly and fraudulently made a false oath.

35.    The Plaintiff has demonstrated that the Defendants at one time owned identifiable

assets that are no longer available to their creditors.  But, as earlier shown, those were lost before

the bankruptcy filing when they had no demonstrated value, and their former existence within

Debtors' assets did not have any effect or materiality on efforts of the Trustee or creditors to find

assets available to the bankruptcy estate.

36.    Plaintiff argues under § 727(a)(5) that Defendants have failed to explain

satisfactorily their loss of ownership interests in F.C. Pilgrim, Pilgrim Companies, Pilgrim

Management, and Bonnie Brae Development, LLC.  To the contrary a full explanation of all that

was given.

On May 21, 2010 the Debtors filed an Amended Statement of Financial Affairs (the

"Second Amended SFA"). [Trial Stip. at ¶ 52; DX 43; PX 53]. The Second Amended SFA

explained that Debtor Michael O'Neill had lost his ownership interest in Bonnie Brae, Pilgrim

Management Co. and Pilgrim Companies, Inc. before the bankruptcy filing and the circumstances

- 49 -

under which Michael O'Neill lost the ownership interests, by stating "On or about 12/18/09,

Michael O'Neill's interest in Pilgrim Management Co and Pilgrim Co.'s Inc. were forfeited

pursuant to a disposition of collateral pursuant to 810 5/9-611" and "On or about 2/16/10,

Michael O'Neill's interest in Bonnie Brae Development, LLC was terminated". [Trial Stip. at

¶ 52; DX 43 at ¶ 4 (p. 4); PX 53].

 Plaintiff conceded at trial that the Second Amended SFA corrected the Debtors'

bankruptcy filings. [TR 94:13-18, "THE COURT: . . . By May, . . . they had corrected their

schedules; isn't that right? At least to reveal the transactions that you're complaining about. MR.

QUAID: Yes, for the first time."; TR 410:11-19]. Plaintiff does not contend that the Second

Amended SFA was false. [TR 410:25 – 411:4, "THE COURT: Counsel, do you contend that the

final iteration of the schedules was false?" MR. QUAID: "No, that it was too late, and that it was

a part of a plan to try to throw people off the track."; TR 411:19 – 25, "THE COURT: You have

not demonstrated from the evidence that it was – a final iteration of the schedules was false, have

you? MR. QUAID: "I have not."].

 37. Plaintiff has argued that the acts terminating the former interests were carried out

before Defendants were actually in default in their payments, and he finds the early termination

to be suspicious.  Stipulated documents do show that there might have been an arguable basis for

delaying the termination of interests.  However, given the lack of proof of value in the lost assets,

there was no economic reason demonstrated for Debtors to resist disclosure of their former

interests.

### *The Plaintiff Did Not Establish An Objection*
### *To Discharge Under 11 U.S.C. § 727(A)(5)*

38.     Trial evidence established that the Debtors satisfactorily explained their loss of

assets in the Second Amended SFA and provided documentation to substantiate their loss of

interests in discovery and in the Attachment to the Second Amended SFA.[6]  A creditor objecting

to discharge based on debtor's alleged failure to satisfactorily explain loss of assets has the initial

burden of identifying the assets in question by appropriate allegations in the complaint, and proof

showing that the debtor at one time had assets but that they are no longer available for debtor's

creditors.  Once the creditor has introduced some evidence of the disappearance of substantial

assets, the burden shifts to the debtor to explain satisfactorily the losses or deficiencies. *In re*

*Potter*, 88 B.R. 843, 849 (Bankr. N.D. Ill. 1988). The Second Amended SFA explained the pre-

bankruptcy loss of Michael O'Neill's ownership interests in Bonnie Brae, Pilgrim Management

Co. and Pilgrim Companies, Inc. [Trial Stip. at ¶ 52; DX 43 at ¶ 4 (p. 4); PX 53].[7]  Moreover, the

Plaintiff conceded at trial that the Second Amended SFA corrected the Debtors' bankruptcy

---

[6] The Plaintiff's Post-Trial Brief argues that the documents referenced in the Second Amended
SFA were not provided until the Attachment to the Second Amended SFA was filed on July 26, 2010.
[Adversary Dkt. 95 at p. 4]. However, the trial evidence established that the documents referenced in the
Second Amended SFA were provided to counsel for the Plaintiff on May 27, 2010 (within a week of the
filing of the Second Amended SFA). [TR ¶ 59; TR 259:8 – 260:25].

[7] The clear and undisputed explanation for the loss of assets in the Second Amended SFA, and
substantiation of the losses through documents produced to the Plaintiff and filed with the Court,
distinguishes the instant case from the caselaw cited by the Plaintiff in support of his objection to
discharge under 11 U.S.C. § 727(a)(5) in which the explanations were not provided, vague and/or
uncorroborated. *See In re Stamat*, 395 B.R. 59, 77 (Bankr. N.D. Ill. 2008) (debtors unable to
explain loss of cash removed from bank accounts); *In re Hansen*, 325 B.R. 746, 764 (Bankr. N.D. Ill.
2005) (debtor unable to explain loss of proceeds from sale of house); *In re Hasan*, 245 B.R. 550,
555 (Bankr. N.D. Ill. 2000) (debtor unable to explain loss of $125,000 in funds); *In re Costello*,
299 B.R. 882 (Bankr. N.D. Ill. 2003) (debtor unable to explain loss of income and proceeds from
transfer of assets); *In re D'Agnese*, 86 F.3d 732, 734-5 (7th Cir. 1996) (debtor unable to explain
depletion in assets).

filings, and the Plaintiff did not contend that the Second Amended SFA was false. [TR 94:13-18, 410:25 - 411:4]. The Plaintiff did not dispute at trial that Michael O'Neill lost his stock in Pilgrim Companies, Inc. and Pilgrim Management Co in the December 2009 foreclosure, months before the bankruptcy was filed. [TR 29:15-30:17]. The Plaintiff also did not dispute at trial that Michael O'Neill lost his membership interest in Bonnie Brae on February 16, 2010, before the bankruptcy was filed. [TR 31:22-24].

By the Plaintiff's own admission, prior to the final meeting of creditors the Second Amended SFA truthfully explained Michael O'Neill's loss of assets and the Plaintiff's objection to discharge fails. Under 11 U.S.C. § 727(a)(5), the Court is not concerned with the wisdom of the debtor's disposition of their assets and income but rather the Court focuses on "the completeness and truth of the debtor's explanation." *In re Stamat*, 395 B.R. 59, 76 (Bankr. N.D. Ill. 2008); *In re Costello,* 299 B.R. 882, 901 (Bankr. N.D. Ill. 2003). In our case, the Plaintiff did not contest the completeness and truth of the Debtors' explanation provided in the Second Amended SFA. [TR 94:13-18, 410:25 – 411:4].

39.     The accuracy of the information contained in bankruptcy schedules and statements of financial affairs is the responsibility of the debtors, and the debtors have a duty to consider carefully all questions posed to them and ensure that complete and correct answers are provided. *In re Saylor* at 193. *See also In re Dawley,* 312 B.R. 765, 787 (Bankr. E.D. Pa. 2004); *In re Sofro,* 110 B.R. 989, 991 (Bankr. S.D. Fla. 1990) (citing *In re Burke,* 83 B.R. 716 (Bankr. D.N.D. 1988)); *In re Dias,* 95 B.R. 419, 424 (Bankr. N.D. Tex. 1988); *In re Diodati,* 9 B.R. 804, 808 (Bankr. D. Mass. 1981).

40.     It is true, as Plaintiff argues, that an attorney's conduct must be imputed to his client in any context." *U.S. v. DiMucci*, 879 F2d 1488, 1496 (7th Cir. 1989). "Ultimately, it is debtors who are responsible for the accuracy of the information contained in their bankruptcy schedules and statement of affairs [and] it is they who have the duty to carefully consider all of the questions posed and to see that they are completely and correctly answered." *Watson v. Moss*, 619 F.2d 776, 776 (8th Cir. 1980). However, *In re Radloff*, 418 B.R. 316, 326 (Bankr. D. Minn. 2009), it was pointed out that "the Debtor's reliance in fact on counsel to complete the form in a way responsive to the statutory requirements bolsters a finding of no knowledge or fraudulent intent on the Debtor's part."

Therefore, the following trial evidence is relevant:

The Debtors assembled and provided documents and information relating to their financial condition to their bankruptcy counsel for drafting the bankruptcy filings. [TR 206:11-17, 208:11-17, 217:15-23, 219:23-220:17]. The documents and information the Debtors provided to their bankruptcy counsel for preparing the bankruptcy filings included Michael O'Neill's loss of membership interest in Bonnie Brae and loss of stock in Pilgrim Management Company and Pilgrim Companies, Inc. [TR 207:9-19, 208:20-209:3, 219:23-220:11]. The Debtors did not intentionally withhold any financial or other information from their bankruptcy counsel in connection with preparing the bankruptcy filings. [TR 209:4-8, 217:15-23, 219:23-220:17, 232:18-234:4, 234:20-235:13]. Counsel for the Debtors drafted the bankruptcy filings. [TR 208:4-19]. The Debtors relied on their bankruptcy counsel to prepare the bankruptcy filings completely and accurately. [TR 209:9-12, 217:15-23, 219:23-220:13, 227:13-25].

- 53 -

41.     Plaintiff must show intent to deceive, but that is lacking here. The Debtors in the instant case did not recklessly disregard the accuracy of the information in their bankruptcy filings like the Debtors in *In re Saylor*. 339 B.R. at 193 ("the debtors testified that they were allowed to sign the statement of affairs and schedules without having read them. The documents were simply handed to them by someone at counsel's office who instructed them where to sign and the debtors did so; they signed the documents without any effort to study them, verify their accuracy, or question the information they contained"). These Debtors read their lengthy filings, but not with sufficient care.

42.     It is correctly argued by Plaintiff that "[A] debtor's reckless disregard for the truth of the information contained in its bankruptcy statements and schedules is sufficient to bar a discharge and may be regarded as the equivalent of actual fraud on the part of a debtor who submits false or inaccurate information. *Id. See also, Montgomery*, 86 B.R. at 957; *In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992); *In re Tully*, 818 F.2d 106, 112 (1st Cir. 1987). However, that legal concept does not apply under the facts found above.

43.     "If the bankruptcy schedules reflect such an indifference to the truth then no further evidence of fraud is necessary." *In re Saylor*, 339 B.R. at 193. Reckless disregard means "not caring whether some representation is true or false." *In re Chavin*, 150 F.3d 726, 728 (7th Cir.1998). *See also, In re Diodati*, 9 B.R. 804, 809 (Bankr. D. Mass. 1981) (quoting *Le Lievre v. Gould*, 1 Q.B. 491, 498 (1893)).

44.     The debtors in *Saylor* were recklessly indifferent to the truth of the information they provided because (1) they testified that they did not understand the questions posed to them while completing the statement of affairs; (2) even though they did not know what was being

- 54 -

asked of them; (3) they did not disclose their lack of understanding or ask any questions to clarify

or explain; and (4) the debtors were allowed to sign the statement of financial affairs and

schedules without having read them and signed them without any effort to study them, verify

their accuracy, or question the information contained therein. *In re Saylor* 339 B.R. at 193.

45.    Conduct by the debtors in *Saylor* showed a classic example of "not caring whether

some representation is true or false" and demonstrate a reckless disregard for their accuracy. *In re*

*Saylor* at 193 (quoting *In re Chavin,* 150 F.3d at 728). *See also In re Olbur,* 314 B.R. at 746; *In*

*re Sims,* 148 B.R. 553, 557 (Bankr. E.D. Ark. 1992).

However, for reasons detailed above, Defendants have met their burden of explanation

under § 727(a)(5) and so Plaintiff is denied judgment under that provision.

### *Count II § 523(a)(2)*

46.    Pursuant to 11 U.S.C. §523(a)(2) a "discharge under section 727... of this title

does not discharge an individual debtor from any debt (2) for money, property, services, or an

extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false

representation, or actual fraud, other than a statement respecting the debtor's or an insider's

financial condition." (emphasis supplied.). The standard of proof for the dischargeability

exceptions under 11 U.S.C. § 523(a) is preponderance-of-the-evidence. *Grogan v. Garner,* 498

U.S. 292, 293 (1991). In Count I, Plaintiff contended that Defendants had assets that they held

from the Bankruptcy Trustee or could not explain the loss of. In Count II, Plaintiff contends that

Defendant represented in loan negotiations that they actually had such assets but that such

representations were false because Defendants assertedly never possessed the assets represented.

While nothing bars inconsistent pleading in the alternative, the proof in Count I of interests

- 55 -

formerly owned by Defendants contradicts the argument in Court II that those same or related

assets were never owned by either Defendant. In short, if Defendants represented in the

negotiations with Plaintiff something about assets owned, that was proved in Count I to have

been substantially true.

47.    In order to except false pretenses or a false representation from dischargeability,

the Plaintiff must establish the following elements: (1) the Defendants obtained funds through

representations that the Defendants either knew to be false, or made with such reckless disregard

for the truth as to constitute willful misrepresentations; (2) the Defendants possessed the requisite

scienter, i.e., they actually intended to deceive the Plaintiff; and (3) to his detriment, the Plaintiff

justifiably relied on the Defendants' misrepresentations. *In re Jairath*, 259 B.R. 308, 314 (Bankr.

N.D. Ill. 2001) (citing *Caez v. Jacob (In re Jacob)*, No. 97–A–01664, 1998 WL

150493, *4 (Bankr. N.D. Ill. 1998); *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 673

(7th Cir. 1995), *cert. denied*, 516 U.S. 1008, 116 S.Ct. 563, 133 L.Ed.2d 488 (1995)). However,

the Plaintiff must also establish that his reliance was justifiable. *Mayer v. Spanel Int'l Ltd.*, 51

F.3d 670, 673 (7th Cir. 1995).

### *Does the Law Require Due Diligence of Plaintiff?*

48.    One legal issue is whether Plaintiff was required, as a matter of law, to conduct

due diligence before making his loan. Debtors argue that Plaintiff did no due diligence and,

therefore, cannot be found to have justifiably relied on the statements. In *In re Ojeda*, a Panel of

Seventh Circuit Judges noted: "As the Supreme Court held in *Feld v. Mans*, 516 U.S. 59, 71

(1995), creditors have no duty to investigate if they are unaware of the potential falsity." 599

F.3d 712, 718 (7th Cir. 2010), though outside information received by the creditor could trigger

- 56 -

such a duty. *Id.* Debtor argues that Plaintiff could have seen from corporate documents had he

requested them the nature of the ownership structure. But the evidence did not show that

Plaintiff received information that should have aroused suspicion, and thereby no duty to

investigate became evident.

### *Can an Oral Statement be a "Statement of Financial Condition?*

49.     Another legal issue is whether Michael's statements regarding discussing

ownership of F.C. Pilgrim & Co. was a "statement of financial condition" and therefore beyond

the scope of § 523(a)(2)(A). Debtors argue that those statements concerned their financial

condition and therefore should have been in writing to be actionable under the "other than . . ."

clause of the statutory provision. If those statements are "statements of financial condition" then

they may not be grounds for a non-dischargeability action unless they are in writing and

otherwise satisfy the requirements of § 523(a)(2)(B). Subsections 523(a)(2)(A) and (a)(2)(B) are

mutually exclusive. If a statements respecting the debtor's financial condition is communicated

orally, a legal issue arises. The difficulty lies in determining whether a particular representation

is a statement respecting the debtor's financial condition.[8]

---

[8] Under § 523(a)(2)(A) a discharge does not apply to any debt:

> [f]or money . . . to the extent obtained, by - false pretenses, a false
> representation or actual fraud, other than a statement respecting the
> debtor's or an insider's financial condition . . . . [Emphasis supplied]

Section 523(a)(2)(B) excepts from discharge a debt for:

> "money . . . to the extent obtain by use of a statement in writing (1) that
> is materially false; (2) respecting the debtor's . . . financial condition;
> (3) on which the creditor to whom the debtor is liable for such money . .
> . reasonable relied; and that (4) the debtor cause to be made or published
> with intent ro deceive." [Emphasis supplied]

- 57 -

As observed in *Collier's on Bankruptcy*, neither the phrase "respecting the debtor's . . . financial condition" [in § 523(a)(2)(A)] nor the term "financial condition" [in § 523(a)(2)(B)] is defined in the Code. Opinions are divided on the proper scope of those terms. *Collier's* P. 523.08 (citing cases). Some hold that the term "financial condition" refers only to the debtor's overall financial condition, such as the debtor's overall financial health. *Id*. This narrow construction might permit alleged oral misrepresentations regarding facts such as the ownership of specific property to fall within § 523(a)(2)(A). This construction avoids the statutory requirement found in § 523(a)(2)(B) that requires the misrepresentation to be in writing. Other opinions rely on the statutory text and conclude that factual representations regarding ownership of an asset "go to the very heart of a [debtor's] financial condition" and have held that the term "financial condition" requires a writing. *Engler v. Van Steinburg*, 744 F.2d 1060 (4th Cir. 1984); *In re Redburn*, 202 B.R. 917, 928 (Bankr. W.D. Mich. 2002). In an action under § 523(a)(2)(A), the statute expressly excludes "a statement respecting the debtor's . . . financial condition, while § 523(a)(2)(B) expressly requires a "statement in writing . . . respecting the debtor's . . . financial condition . . ." Based on the statutory text, it would seem in the absence of definitive higher authority that Plaintiff's lack of a writing can be viewed as fatal to Count II.

It is not clear what approach would apply in the Seventh Circuit Court of Appeals if the issue were directly decided. In *In re Ojeda supra*, the debtor-defendants orally represented their continued ownership in two McDonald's restaurants after they had sold those restaurants. 599 F.3d at 714–15. The creditor-plaintiff argued that the representations were false and committed with the intent to deceive. *Id*. at 716. The Circuit Panel opinion ruled the debt owed was non-dischargeable. *Id*. at 720. The Panel did not expressly adopt a position on the scope of

§ 523(a)(2)(A) and did not discuss whether the statements regarding ownership of the restaurants

was a "statement of financial condition." The central issue in that case was whether the creditor-

plaintiff's reliance on those oral statements (in addition to a written pledge of stock in another

company) was justifiable. *Id.* at 716–18.

A Panel of the Fourth Circuit expressly ruled in a short opinion on the issue in *Engler v.*

*Van Steinberg*, 744 F.2d 1060 (4th Cir. 1984). In that case, the Opinion upheld a Bankruptcy

Judge's holding that the debtor's oral representations that he owned property free and clear related

to his financial condition. *Id.* at 1060–61. The Panel reasoned that "Congress did not speak in

terms of financial statements. Instead, it referred to a much broader class of statements - those

'respecting the debtor's . . . financial condition .'" *Id.* The Panel went on to say, "[a] debtor's

assertion that he owns certain property free and clear of other liens is a statement respecting his

financial condition." *Id.* at 1061. Under this broad view, Michael's statements regarding

ownership of F.C. Pilgrim & Co. might be a "statement . . . respecting the debtor's . . . financial

condition," actionable under § 523(a)(2)(B), but not actionable under § 523(a)(2)(A).

In this case, Plaintiff does not content that § 523(a)(2)(B) applies nor does he sue under

that provision. Rutilli argues that Debtors' conduct falls within § 523(a)(2)(A). His arguments

did not thoroughly address the issue whether oral statements regarding ownership of F.C. Pilgrim

& Co. are statements of financial condition and therefore beyond the scope of § 523(a)(2)(A).

However, even assuming without deciding that Count II is not foreclosed by the statutory

language, this case turns on the basic contention that representations of ownership in a company

were made and relied on so as to obtain the loan by false pretense or misrepresentation. Since

neither falsity nor reliance was proven, this Count of the Complaint is lost whether or not the

statutory language bars the action in the absence of a written representation of financial

statement.

As for falsity, Plaintiff's proof under Count I showed that Defendants did hold some

interest in a "Pilgrim" entity, so therefore Defendant's oral references to that interest before the

loan was made were substantially accurate, particularly where no written representation was

requested or given to define the nature of the interest. The purported "representation" that

Michael O'Neill owned F.C. Pilgrim & Co. was substantially true because Michael O'Neill then

held a controlling ownership interest in F.C. Pilgrim & Co. [Trial Stip. at ¶ 7; DX 8 – 11;

TR 257:11-17].

50.    On the issue of reliance, Plaintiff asserts that he would not have entered into the

First Promissory Note, Second Promissory Note or Third Promissory Note if the Defendant

Husband did not own F.C. Pilgrim.

No such reliance was written into the transaction documents, and no documentation as to

such ownership was requested. On various occasions in 2003 and 2004, the Plaintiff indicated to

Michael O'Neill that the Plaintiff was interested in investing in real estate as a lender.

[TR 173:18-174:10, 174:20-175:17, 254:9-255:22, 293:10-17]. On April 19, 2005, the Plaintiff

funded the acquisition of the Humphrey Property in anticipation of executing a loan agreement

with the Debtors at a later date, under which the Debtors would repay the Plaintiff, with interest,

for the purchase price of the Humphrey Property. [TR 180:15-25, 182:17-183:5, 249:14-18; DX

57]. At the time the Plaintiff funded closing of the Humphrey Property there was no loan

agreement in place with the Debtors, and the parties had not even discussed any terms and

conditions relating to the loan. [TR 179:2-4, 180:15-25, 182:17-25, 183:11-14; 296:6-17].

The trial evidence established that the Plaintiff did not demand any specific representation regarding ownership of F.C. Pilgrim & Co. nor did he investigate the F.C. Pilgrim & Co. ownership structure or value of that ownership's interest. The Loan Agreement that the parties executed in May 2005 did not contain any representations to Plaintiff at all, let alone any representation that Michael O'Neill owned F.C. Pilgrim & Co. [DX 17; TR 185:12-15, 389:9-12]. Also, none of the alleged "representations" were made in connection with the May 2005 Loan Agreement. [TR 308:2 – 339:18, 365:20 – 367:16]. None of the purported "representations" that the Plaintiff testified to were made at any time during which the Plaintiff and the Debtors were negotiating the terms and conditions of the Loan Agreement in April and May 2005. [TR 179:2-4, 180:15-25, 182:17-25, 183:11-14; 296:6-17, 293:10 – 23, 308:2 – 339:18, 365:20 – 367:16, 370:16–371:15]. Moreover, the Plaintiff did not request any personal or corporate financial information or corporate records, and the Plaintiff did not perform any investigation regarding the purported "representation" that Michael O'Neill owned F.C. Pilgrim & Co. [TR 185:20-186:22, 187:22 – 188:11, 386:9-13, 387:5 – 389:8].

The trial evidence established that the Plaintiff never asked the Debtors for any representations in connection with the Loan Agreement, including never asking for a specific representation that Michael O'Neill owned F.C. Pilgrim & Co. [TR 184:24-185:1, 185:16-19]. The Debtors never provided any representations of fact to the Plaintiff referring or relating the Loan Agreement, and never spoke to the Plaintiff regarding the terms of the Loan Agreement. [DX 17; TR 189:11-15; 191:5-18].

51.    The Plaintiff generally investigated the Defendant Husband and may well have conferred with colleagues and professionals who worked with and for the Defendant Husband to

- 61 -

confirm that the Defendant Husband held some ownership interest in F.C. Pilgrim. However, he did not request any written representation of the details concerning such ownership nor did he request any arrangement by which Pilgrim assets would guarantee or secure the loan. Moreover, the alleged "misrepresentations" at issue in Count II were of a general nature and not directed at the loan. [TR 36:4:10, "THE COURT: Did you just tell me that misrepresentations you rely on were of a general nature in communications between the parties but not necessarily directed at either of these two transactions? MR. QUAID: Leading up to and including the transactions."] Accordingly, Plaintiff did not justifiably rely upon the Defendant Husband's comments about owning Pilgrim interests when he loaned $1,176,000.00 to the Defendants.

Therefore, Count II also fails.

### CONCLUSION

By reason of the foregoing, Final Judgment will be separately entered on both Counts in favor of Defendants.

ENTER:

_____
Jack B. Schmetterer
United States Bankruptcy Judge

Dated this _____ day of February 2012.

- 62 -